UNITED STATES, Appellee

v.

ZELMER WILLIAMS, Private E-2, U. S. Army, Appellant

4 USCMA 241, 15 CMR 241

No. 2539

Decided May 7, 1954

LT COL Herman P. Goebel, Jr., U. S. Army, MAJ Edwin Doran, U. S. Army, and 1ST LT Jack J. Albert, U. S. Army, for Appellant.

LT COL Thayer Chapman, U. S. Army, LT COL William R. Ward, U. S. Army, and 1ST LT Donald M. Sukloff, U. S. Army, for Appellee.

Opinion of the Court

PAUL W. BROSMAN, Judge:

An Army general court-martial found the accused guilty under a specification alleging housebreaking, in violation of

the Uniform Code of Military Justice, Article 130, 50 USC § 724, and also under two specifications alleging larceny. There ensued approval of the findings and sentence by the convening authority, and affirmance by a board of review —the latter expressed in a short-form opinion. Upon the accused's petition, we granted review to determine whether the evidence of record sufficed to support the accused's conviction of housebreaking.

## II

By credible evidence, which appears to have been accepted by the court-martial, the prosecution established that shortly after midnight on October 1, 1952, the accused, a member of Company C, 44th Armored Battalion; Fort Leonard Wood, entered a barracks building assigned to another company. Although the overhead lights in the barracks had been extinguished at the time, visibility was reasonably good; and the accused was seen to inspect the pockets of various fatigue uniforms. He wore no shoes, and his other attire at the time consisted of no more than fatigue trousers and an undershirt. An outcry by a barracks inmate precipitated flight on the accused's part, but an alert guard succeeded in apprehending him. That members of the former's own unit had not been immune from his enterprises was demonstrated by the discovery that he possessed a wrist watch and money missing from the effects of members of Company C— the latter of which items he sought to secrete from investigators by concealment in his rectum. This unusual, but not novel, method of avoiding detection, together with the accused's tactic of appearing without shoes during the nighttime visit to barracks not his own, produced the conclusion, expressed in the Staff Judge Advocate's review, that the accused was an "experienced thief." Not unrelated to this inference, and amply supported by the evidence, is the view that, at the time he entered the barracks in question, he intended to commit larceny therein.

## III

Government counsel argue that, if, as here, evidence exists to sustain a finding that the accused entered the barracks building of another organization with intent to commit larceny therein, the crime of housebreaking has been made out. Defense counsel reply that the entry must be trespassory in and of itself, and that the existence of a criminal intent—without more—does not suffice to show this.

Our inquiry, of course, begins with Article 130 of the Code, which condemns one who "unlawfully enters the building or structure of another with intent to commit a criminal offense therein." It is difficult to see how we can accord to each word of the Article its full meaning if we are to hold that an entry into a building is *per se* unlawful, when undertaken with a contemporaneous intention to commit a crime therein. Accordingly, acceptance of the Government's proposal is precluded by the canon of statutory construction requiring that "effect must be given, if possible, to every word, clause and sentence of a statute." See United States v. Spears, Wright and King, 11 BR–JC 147; 2 Sutherland, Statutes and Statutory Construction, 3d ed, 1943, § 4705. Moreover, we observe that the elements of proof of housebreaking, as set out in the current Manual, specifically require a showing that "the accused *unlawfully entered* a certain building or structure of a certain other person as specified." (Emphasis supplied.) Manual for Courts-Martial, United States, 1951, paragraph 209. On the other hand, the 1949 Manual, in delineating the elements of proof of this crime, stated only that proof must be forthcoming: "(a) That the accused *entered* the place alleged and (b) facts and circumstances indicating an intent to commit a criminal offense therein, as alleged." (Emphasis supplied.) Manual for Courts-Martial, U.S. Army, 1949, paragraph 180e. Yet even under the 1949 Manual housebreaking was not deemed established by a mere showing of entry with felonious intent. United States v. Spears, Wright and King, supra.

Addition of the word "unlawfully" to the 1951 Manual seems to make ex-

plicit the notion that more is required for conviction of housebreaking than a naked entry of a building with intent to commit a criminal offense within its limits. Admittedly, the Code's draftsmen have been guilty of redundancy on occasion. For example, Article 118, 50 USC § 712, penalizes one "who, without justification or excuse, unlawfully kills a human being." As the "killing of a human being is unlawful when done without justification or excuse"—Manual, supra, paragraph 197a—no doubt exists that use of the term "unlawfully" in Article 118 was not demanded. From this, Government counsel conclude that no weight need be given to the inclusion of "unlawfully" within the language of Article 130. The parallelism, however, is incomplete. No construction of Article 118 is discernible under which a killing "without justification or excuse" would be other than unlawful. Thus, no interpretation is available which would make the use of "unlawfully" in Article 118 other than superfluous. On the contrary, a survey of briefs of counsel in this case, and of various other recent and comprehensive discussions of burglary and housebreaking,[1] reveals the availability of a construction of Article 130 which would impute independent meaning to the word "unlawfully," and would not construe it merely to reiterate the requirement that, at the time of entry, the accused harbor a felonious intent. According to that construction, the use of "unlawfully" operates to erect a requirement of a trespassory entry, to show which criminal intent alone does not suffice. United States v. Doskocil, 2 CMR 802. Cf. State v. Mish, 36 Mont 168, 92 Pac 459; Miller v. State, 136 Tex Cr 345, 125 SW2d 596.

Certain jurisdictions by legistative act proscribe an entry with intent to commit a criminal offense, and demand no express statement or showing that the entry be unlawful in its own right. In construing one such statute, a California court felt impelled—by what it deemed the statute's plain meaning—

to conclude that any type of entry was punishable if, at the time it took place, the accused possessed a criminal intent. People v. Barry, 94 Cal 481, 29 Pac 1026. Accordingly, the court considered a defendant guilty of statutory burglary by virtue of his having entered a grocery store during business hours and attempted a larceny therein. Idem; see also People v. Brittain, 142 Cal 8, 75 Pac 314; People v. Descheneau, 51 Cal App 437, 197 Pac 126. Article 130's use of the word "unlawfully"— in light of decisions relying on the plain meaning of statutes in the absence of such a term—suggests to us that a knowing choice was made by Congress.

Admittedly, however, at least one decision states explicitly that one who enters a house with evil design is *per se* entering unlawfully. Pinson v. State, 91 Ark 434, 121 SW 751. And various opinions have announced that a servant, entering his master's home or place of business with a formed intent to commit a crime within, is guilty of having made an unlawful entry— this for the reason that his continuing permission to enter does not embrace an entry made in pursuance of designs which violate the master's trust. State v. Howard, 64 SC 344, 42 SE 173; Young v. Commonwealth, 126 Ky 474, 104 SW 266; Hawkins v. Commonwealth, 284 Ky 33, 143 SW2d 853. See also United States v. Spears, Wright and King, supra. But acceptance of this doctrine as to servants is by no means universal. Stowell v. People, 104 Colo 255, 90 P2d 520. Cf. State v. Corcoran, 82 Wash 44, 143 Pac 453. Considered against the legislative and other background of Article 130, together with its acompanying discussion in the Manual and in prior military cases, we regard as easily outweighed those few civilian decisions equating an entry with felonious intent to an unlawful entry; and we conclude that use of the term "unlawful" in Article 130 must not be regarded as tautological. Indeed, the very term "house-

---

[1] Statutory Burglary—The Magic of Four Walls and a Roof, 100 U Pa L Rev 411 (1951); Development of the Law of Burglary in California, 20 So Cal L Rev 75 (1951); A Rationale of the Law of Burglary, 51 Col L Rev 1009 (1951); Comment, 36 Corn L Rev 565 (1951).

*breaking"* itself connotes the necessity for an initial trespass.

## IV

An understanding of the reasons for the requirement by Congress of a trespassory entry as an element of the crime under scrutiny may be augmented by the examination of rationales to which the offenses of housebreaking and its parent, burglary, are readily referable. Among the legal values first recognized by common law jurists was that having to do with the protection of the sanctity and security of one's dwelling. Not only do the extremely severe sanctions erected against burglary reveal a desire to preserve fully the inviolability of the home, but this is also reflected in the constitutional prohibition of unreasonable searches and seizures and the strict common law doctrines operative in the area of trespass. Correlative to the legal supports for the right of privacy and security in one's abode is the popular attitude implicit in the phrase roughly to the effect that "a man's home is his castle." Correlative also is the considerably greater willingness on the part of Anglo-American courts to use and sanction the doctrine of self-help in protection of the home than is found in societies according less significance to the right of privacy.

The right to privacy in the home can perhaps be equated roughly to the right to exclude others therefrom. Indeed, the right to exclude others from the use of property of any sort, real or personal, may well be deemed the chief ingredient of its value. That which belongs to all, in a very real sense belongs to none. If, however, A is invited by B into the latter's home, does B's right of exclusion require the same protection— despite the presence of a felonious intent harbored by A at the time of entry—as in an instance where A entered stealthily and by trespass? The opportunity for A to commit a crime within the building has, in part, been provided by B's misplaced confidence and want of good judgment. B may, therefore, be considered to have less cause for complaint than one who had not invited entry by the criminal.

Manifestly, B is not to be left entirely at the mercy of his invitee, however substantial his misjudgment, since A is certainly punishable for the commission of any crime—such as theft or, say, rape—which may follow his entry into the building. It has been snggested, too, that B, the host, will have less prompting to use self-help against his felonious-minded guest than would, say, a householder startled at night by an unknown and unexpected invader. Thus, the probabilty of violence by the householder, incidental to the commission of a felony within the building, will be less than in the situation involving trespassory entry. Of course, if there is slighter probability that the occupant will, in such instances, make use of self-help to defend his property, it follows that there will be less likelihood of harm to him resulting from retaliation by the visitor with criminal intentions. In sum, Congress may reasonably have conceived that no strong social interest requires punishment of mere entry with criminal intent where, as in the case of an invitee, no apparent trespass is involved.

Moreover, the trespassory entry required as an element of housebreaking serves to corroborate the existence of criminal intent at the time of entry. Of course, it is occasionally possible to show clearly that an accused possessed a felonious intent at the time of ingress although the entry was not of itself trespassory. See People v. Corral, 60 Cal App2d 66, 140 P2d 172; People v. Vitos, 62 Cal App2d 157, 144 P2d 393; People v. Sanchez, 35 Cal App2d 231, 95 P2d 169; People v. Westwood, 88 Cal App 505, 263 Pac 856 (cases under the California rule). In the distinctly unusual case A may have declared his intention prior to entry. Or perhaps a later confession by him would operate to reveal this intent at the time he entered. However, in the military system, a *corpus delicti* must be established which includes each element of the offense covered by the confession—and this would certainly require some showing of felonious intent at the time of entry, quite independent of the confession. See United States v. Isenberg, 2 USCMA

**245**

349, 8 CMR 149. Perhaps, too, apart from the use of a confession, court members might be permitted to infer that a purpose to commit an offense—one manifested shortly after entry—was in fact present at the time thereof. See Manual, supra, paragraph 138a. With such inferences, however, doubt might arise concerning the effective exclusion by the evidence of all reasonable hypotheses of innocence, and as to the sufficiency of the evidence to show—without reliance on speculation and conjecture—that the accused did indeed enter with a contemporaneous improper intent. Cf. United States v. O'Neal, 1 USCMA 138, 2 CMR 44.

To avoid such difficulties in the proof of intent at the time of original ingress, Congress may well have believed it desirable that housebreaking be defined so as to require an invasion which—considered alone—would be incriminatory, and thus corroborative of the existence of illegal intent at the time of entry. A parallel may be drawn from the field of conspiracy. Certainly Congress has the power to make punishable an agreement in crime irrespective of any overt act to effectuate that concord. Yet in the usual conspiracy statute the legislature has chosen to require proof of an overt act. Uniform Code, Article 81, 50 USC § 675; and 18 USC § 371. Whatever other function it may serve, proof of the overt act in this setting operates to corroborate the existence of the corrupt agreement which is the gravamen of conspiracy. Congress may well have envisaged that a similar purpose would be served by requiring as an element of housebreaking an entry which was itself trespassory.

### V

While recognizing that an "unlawful entry" is not established through a showing of mere ingress with contemporaneous criminal intent, we cannot escape the conclusion that the record before us in the case at bar does reveal such an illegal intrusion. United States v. Doskocil, supra. The evidence demonstrated clearly that no official duty on the part of the accused drew him to the

structure into which he is alleged to have gone unlawfully. Moreover, the record is bare of evidence to the effect that he was invited to enter the building by any occupant. Admittedly the right of privacy in military barracks is limited. However, we cannot conceive it to be so severely restricted as to encompass authority implied to the accused to enter in the dead of night the barracks of a unit not his own, and one in which lighting had been dimmed to sleeping strength.

We are sure that the answer, in terms of the legality of the entry in such a case as this, can only be arrived at through channeling the question to the issue of authorization, express or tacit—and this is true *whatever* the nature of the quarters involved. However, it seems to us that, for reasons of emphasis, it may be useful, and not improper, roughly to classify "building[s] or structure[s]" for the present purpose into three principal groups: (a) Those which are wholly private in character; (b) Those which are public; and (c) Those which are semiprivate. One's home, of course, may be regarded as archtypical of the first category—and as to it every penetration must be regarded as unlawful in the absence of invitation, express or implied. At the far swing of the pendulum we find an example in, say, the rural county courthouse, or perhaps the postoffice—structures containing varying facilities, and ones which in exterior respects frequently remain unbolted around the clock, or largely so. Here, it would seem, all unobstructed incursions must be regarded as licit—that is, as authorized—in the absence of a clear direction to the contrary.

The third class—with an example of which we are concerned here—presents a more complicated problem, and one in which the line between the welcome and the unwelcome visitor is more difficult to draw. Yet we must grapple with the question of authority, of permission, of invitation—call it what we may. Was the accused in a case involving such a structure authorized to act

as he did in the particular case by those sometimes indistinct sources of power to grant the indulgence? The answer to this inquiry will depend on a variety of circumstances, only some of which will be mentioned, and no one of which will necessarily control, or even maintain relevance, in all cases: (a) the nature and function of the building involved; (b) the character, status and duties of the entrant, and even at times his identity; (c) the conditions of the entry, including time, method, ostensible purpose, and numerous other factors of frequent relevance but generally insusceptible of advance articulation; (d) the presence or absence of a directive of whatever nature seeking to limit or regulate free ingress; (e) the presence or absence of an explicit invitation to the visitor; (f) the invitational authority of any purported host; (g) the presence or absence of a prior course of dealing, if any, by the entrant with the structure or its inmates, and its nature—and so on.

Since we have indicated that the lawfulness of an entry for present purposes depends on authorization, negative or positive, express or implied, it follows that the latter is a question for determination in each case. Illegality of the original penetration is an *element* of the offense with which we are dealing. It must be alleged. Manual, supra, Appendix 6c, Forms—Charges and Specifications, Specification No. 104, page 486. It must be the subject of instruction, at least in general terms and *sua sponte*. Code, supra, Article 51(c), 50 USC § 626; Manual, supra, paragraph 209, subparagraph, "Proof." And it must be found. Code, supra, Article 130.

To what extent and in what detail must the law officer instruct on the necessity for a finding of unlawfulness? In our view— and in any sort of case— this functionary sustains the burden placed on his shoulders by Article 51(c) of the Code if, in charging on offense elements, he instructs in the language of the subparagraph, "Proof," found in the relevant paragraph of that chapter of the current Manual headed "Punitive Articles." This is true, of course, *only* on the assumption that the subparagraph includes all of what this Court determines to constitute the essential ingredients of the offense under scrutiny, and no others. It is also true *only* in the absence of a justified request for elaboration and clarification.

It is our view that, in the case of housebreaking, the subparagraph, "Proof" Manual, paragraph 209, does include all elements and no others. In the abstract these are: (1) an unlawful, (2) entry, (3) into the building or structure, (4) of another, (5) with intent, (6) to commit, (7) a crime, (8) therein. In the instant case the law officer clearly instructed in these terms—and there was no sort of request for clarification. Therefore, there was no error.

It is manifest that the extent to which a request for elaboration will require additional instructions may not safely be the subject of generalization. Necessarily it will depend in large part on the substantiality and complexity of the fact problems involved in a particular case. The standard to be applied, as we see it, may be expressed in terms of the following question: Was the court-martial informed fully of the issues before its members in order that it might act intelligently on the problem before it? In view of the technical and somewhat unusual character of the element of unlawfulness, doubts should be resolved by law officers, on request in such a case as this, in favor of supplying a careful and detailed charge.

We believe that this analysis of the problem places no harsh burden on the accused—certainly a no more onerous one than that which follows other holdings of this Court related to the necessity for a request for instructional elaboration. To our minds, the result we have reached constitutes no more than a further instance in which the "balance of convenience can be redressed without oppression to the defendant." United States v. Gohagen, 2 USCMA 175, 7 CMR 51.

The instant case came to this Court

under a specified issue relating to the sufficiency of the evidence as a matter of law to support the court's conviction of housebreaking. It is apparent that much of what has been said in preceding sections is related in only an indirect and preliminary way to the narrow question before us. However, it has been furnished in the elaborate form used largely for the guidance of those tribunals below us in the military judicial hierarchy. It follows, of course, from what has gone before that—under any permissible evaluation of the present problem—we entertain no doubt whatever concerning the sufficiency of the evidence to support the court-martial's action.

Accordingly, the decision of the board of review is affirmed.

Judge LATIMER concurs.

Chief Judge QUINN concurs in the result.