UNITED STATES, Appellee

v

LARRY J. HARVEY, Private, CLARENCE R. LEE, Specialist Four, and ARNOLD E. TAYLOR, Private, U. S. Army, Appellants

21 USCMA 39, 44 CMR 93

No. 23,860

August 13, 1971

*Captain Bernard J. Casey* argued the cause for Appellants, Accused. With him on the brief were *Colonel George J. McCartin, Jr.,* and *Captain Robert A. Savill.*

*Captain Gordon F. Bailey, Jr.,* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant, Lieutenant Colonel Ronald M. Holdaway, Captain John C. Lenahan,* and *Captain Richard L. Menson.*

## Opinion of the Court

QUINN, Judge:

A fire in the office of the company commander led to a separate charge against each accused of arson, in violation of Article 126, Uniform Code of Military Justice, 10 USC § 926. Additionally, the accused Private Taylor was charged with violation of a gen-

40

eral regulation by possession of alcoholic beverages in the company area (Charge II and its specification).[1] All accused were convicted as charged and individually sentenced to a dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for two years.[2] On this appeal, each challenges the sufficiency of the evidence to support the findings of guilty of arson.

Sergeant Timmons, who extinguished the fire, described it as "just a small fire" of some papers on a bookcase against the wall behind the commander's desk which "burned the wall . . . and the curtains" at a window above the bookcase. No direct evidence was presented to indicate that the fire had been deliberately and maliciously set. To establish that element of the offense, the Government relied upon the presence of certain words on the floor of the office near the desk and a used paper matchstem found on the windowsill. The match was burned only at the upper part which led another Government witness to testify that, in his opinion, "this match was struck and . . . went out." The words on the floor were, " 'You're dead' "; they were written in blue paint. The rest of the Government's case was directed to establishing a connection between each accused and the paint and burned match.

The chain of events important to the arson charge began with a meeting of about ten platoon leaders and platoon sergeants with the company commander in his office at 6:00 p.m. The office adjoined the orderly room with a door between the two; another doorway connected with the office of the executive officer. A sketch of the arrangement of the various rooms and furniture in them is set out in the Appendix.

The meeting was to review a training exercise for the next week. The platoon personnel were grouped sitting and standing in a semicircle around the commander's desk; many smoked and a window was opened "because of the smoke that was in the room." The meeting concluded about 8:00 p.m., and the commander and platoon personnel left the office. Acting First Sergeant Villarreal who had attended the meeting remained in the "area" until about 8:30 or shortly before 9:00 p.m. The only other persons in the building with him were Sergeant Timmons, who was in charge of quarters, and his runner, Specialist Rountree. Before Villarreal left, following his usual routine, he went through the office of the commanding officer to the office of the executive officer to "make sure" a safe located there was locked. He did not know whether the outer door in the EO's office leading to the outside of the building was locked or unlocked. Strangely, Villarreal was not asked and he did not testify whether he had seen the writing on the floor or had noticed and examined any cigarette stubs in the area of the fire. Timmons was supposed to see that "the CO's room is neat and orderly," but he had not attended to the matter before the fire.

Sometime before Villarreal's departure at 9:00 p.m., Timmons and Rountree began "kidding around." Rountree picked up an aerosol paint can and asked Timmons if he "would like to have a green nose." The record does not indicate whether Rountree sprayed any paint from the can; it also appears that eventually he put the can down on the table in the orderly room.

Starting about 9:00 p.m., six persons, including the three accused, came into

---

[1] Each accused was represented by different appointed counsel. Although Taylor's counsel moved to dismiss the second charge of violation of a regulation on the ground that its joinder with the arson offense was impermissible (see Manual for Courts-Martial, United States, 1969 (Revised edition), paragraph 26c), none of the accused moved for a separate trial. See Manual for Courts-Martial, supra, paragraphs 33l and 69d; United States v Payne, 12 USCMA 455, 459, 31 CMR 41 (1961).

[2] The Secretary of the Army modified Taylor's sentence by reducing the dishonorable discharge to a bad-conduct discharge.

the orderly room to sign in as they were required to do every hour on the hour until 10:00 p.m. They stayed only "long enough to sign in" and talk "a few minutes" with Timmons. It does not appear whether any of the six commented upon, or handled, the paint can. However, Timmons testified that after the fire, which was discovered about 10:30 or 10:40, he found the can either "on" or "in" the clerk's desk in the orderly room. There was no evidence to indicate who moved the can, when it was done, or how it was done.

At an unspecified time, but apparently between 9:30 and 10:00 p.m., Specialist Malone, one of the persons required to sign in, received a telephone call on an orderly room phone. Timmons went to the orderly room porch and "called across to the next barracks." As a result, Malone came to the office. He was accompanied by the accused and others required to sign in. Apparently, on entering, Specialist Lee asked Timmons whether he had received a telephone call. He got a negative reply, but "shortly after the phone rang" on Timmons' desk. It was a call for Lee. Lee talked to the caller for a time while Timmons remained at the desk and then went into the TDY (temporary duty) room to talk on the telephone there because of the "noise."

Sergeant Timmons testified that, during the hour or so that elapsed between the time Lee went into the TDY room and discovery of the fire, he sat at his desk. From that position he could observe the whole of the orderly room and the entrance to the TDY and TNG (training) rooms. The door to the CO's office was closed. Had anyone attempted to enter that office from either the orderly room or through the EO's room, by entering through the EO's doorway opening on the main corridor, he would have seen him. According to Timmons, he did not see Lee leave the TDY room during the entire interval. His testimony is corroborated by that of a defense witness, Miss Yarborough, the person who talked to Lee on the telephone. Timmons further testified that the accused

Private Harvey was with Malone in the TNG room. While he could not see Harvey in that room, he would have seen him if he had come out. Once, Harvey did come out and requested a cigarette which he gave him; Harvey then returned to the TNG room. From time to time, Timmons heard Harvey in the TNG room. Finally, Timmons stated that during the entire period he talked to Taylor, who was "in front" of him and who "never left" that position until the fire was discovered. It may be inferred from some of Timmons' testimony that Rountree had left the orderly room to get someone for Timmons.

About 10:20 p.m., Specialist Henriques came into the orderly room to report in from a three-day pass. As he entered, he saw Lee on the telephone in the TDY room; Taylor and another man were talking to Timmons and Harvey was with Malone in the training room "arguing about who was going out with which girl." Henriques went to one of the clerk's desks, sat down, and "started to read" a magazine.

Henriques testified that when he entered the orderly room he "smelt an odor" which was "like incense." Apparently, he said nothing about it. Within a few minutes of his entry, Specialist Richards came in. He announced he wanted to use the latrine which was in the EO's office and "just trotted off in there," entering directly through the doorway near the main entrance to the offices. He remained about a minute; came out of the office and left. About five or ten minutes later, Specialist Lystrom came in. He asked, " '[w]hat's burning' " and said something "about smoking cigars." "Everybody looked around." Timmons "could see smoke" at the top of the ceiling "floating around." A space separated the partition wall between the orderly room and the CO's and EO's offices. Timmons "yelled fire or something and everybody . . . started to look for the fire." Timmons ran into the EO's office through the front door, reasoning that the fire was probably not in the TDY or TNG rooms be-

cause the persons there "would have ran out and told me," so the fire either "had to be" in the EO's or CO's office. Henriques entered the CO's office which was about three feet from the desk at which he was seated. There, he "spotted" the fire at the bookcase. Timmons obtained a fire extinguisher and put out the blaze. However, as soon as the fire was extinguished, Timmons examined the windowsill. There, he found the matchstem. He picked it up, but later replaced it. When he saw the painted words on the floor, he got the spray can of paint from the orderly room and sprayed some paper. He placed the sample of paint on the paper next to the painted words on the floor and "it matched up." He thereupon telephoned the commanding officer, first sergeant, and the police.

At 10:55 p.m., Criminal Investigator McMoore arrived at the orderly room. He took possession of the matchstem from the windowsill. He did not separate the debris from the fire and his "visual check" would "[n]ot necessarily" have disclosed whether it contained "a match that was burned all the way." He took scrapings from the words on the floor and he inspected the boots and clothing of the "people that were . . . in the orderly room earlier that evening."

Harvey was the first person checked. "[T]races of what appeared to be paint that was similar to the paint . . . on the floor" was found on one of his boots. McMoore took the boot. A photograph of the boot, introduced as Prosecution Exhibit 5, shows several spots. Paint "of the same caliber" was found on Taylor's left boot; it, too, was seized. A photograph of it, Prosecution Exhibit 6, shows numerous paint spots on the side and toe. Also taken from Taylor was a paper matchfolder. It contained a stem which "[t]o the eye" indicated it might "possibly" be that from which the match found on the windowsill had been torn. In his inspection of Lee, McMoore found at the top of the right index finger and under the fingernail blue paint "similar in color to the paint on the floor." The paint had

"somewhat of a shiny . . . appearance"; it "didn't appear to be disturbed from any activity that . . . [Lee] might have participated in during the evening" and it "appeared to be fresh to a degree." After inspection of the personnel, McMoore took possession of the spray can which he found in the orderly room "sitting on . . . [the] small table just outside . . . the CO's office." Testimony by Dillard Browning, a chemist with the Army Criminal Investigation Laboratory, Fort Gordon, Georgia, indicates that paint from the spray can, the scrapings of the paint from the floor of the CO's office, and the paint on the boots taken from Harvey and Taylor were "grossly" similar, which meant their "trace elements" of raw material and contaminants were the same. For convenience, we consider the remainder of the evidence as it separately affects each accused.

### AS TO LEE

McMoore testified that he had called over Sergeant Villarreal to look at the paint on Lee's finger. However, Villarreal, who also testified as a Government witness, was not asked to describe what he saw. McMoore did not scrape any paint from Lee's finger. Thus, the only evidence that ties Lee to the painted words on the floor of the CO's office is McMoore's testimony that the paint on Lee's finger was "similar in color" and "appeared to be fresh to a degree" as the paint in the CO's office.

Assuming that McMoore's testimony is sufficient to justify a conclusion that Lee handled the spray can in issue, the question is whether he did so in the CO's office. There is a possibility that he took the can with him after he signed in at 9:00 p.m., and sometime between then and his return to the orderly room with Malone he entered the EO's office, proceeded to the CO's office and wrote or participated in the writing of the words on the floor, and started the fire on the bookcase. The difficulty with this hypothesis is that it has no support in the evidence and

in fact is inconsistent with the prosecution theory that the fire was started sometime after Lee and the others came to the orderly room with Malone, after he had been called by Timmons to answer the telephone. Moreover, the hypothesis is inconsistent with Lee's interest in whether he had had a telephone call and inconsistent with the remark he made to Miss Yarborough when he terminated his conversation with her. After Timmons yelled fire, Henriques saw Lee come "out of the TDY room." Lee then told Miss Yarborough that he had "to get off the phone" because "some fool in here started a fire." Rejecting the hypothesis as speculative and inconsistent with the other evidence, leaves only the possibility that Lee handled the spray can after he came into the orderly room with Malone. Except possibly for a brief interval after entering the orderly room, Lee, according to Timmons, was always in his sight or hearing. From Timmons' testimony, it is apparent that that interval was just too short to allow a finding beyond a reasonable doubt that Lee went into the CO's office, painted the words on the floor, and set the fire. We conclude, therefore, that the Government failed to prove Lee's guilt beyond a reasonable doubt.

## AS TO TAYLOR

Microscopic and gas chromatography analysis of paint from the spray can, paint scraped from the floor of the CO's office, and paint from Taylor's boot indicated they were "grossly similar" in texture and color, and chemically. It also appears that paint from Taylor's boot was cut with a doctor's scalpel from the top areas of "very well-formed droplets." Browning, the Government's chemist, acknowledged that the manufacturer's paint batch, providing the paint for the spray can, could also have been issued in "regular liquid form" and in other "aerosol cans"; he also acknowledged that paint sprayed from the can would form "very small dots," while paint dropped from a brush would form "droplets." The spots on Taylor's boot were "marked

for easy identification" by Browning. The number and size of the spots, as they appear in the photographic exhibit, correspond so much more to "droplets" than to the "very small dots" projected by an aerosol can that some doubt is generated that the paint came from the can in issue, but even if that doubt is put aside and we assume that Taylor had the spray can in his possession and used it, the question is whether he used it in the CO's office.

Timmons testified unqualifiedly that he was face to face with Taylor almost from the time Taylor entered the orderly room until the fire was discovered. No witness testified to the contrary, but the Government contends that the physical evidence demonstrates that Taylor succeeded in getting into the CO's office undetected, painted the words on the floor, and set the fire. According to the Government, the matchstem found in the CO's office "fit perfectly into a socket" of the matchbook taken from Taylor, and the presence of this stem in the CO's office demonstrated conclusively that Taylor had been there. The record, however, does not support the Government's contention of this degree of correspondence between the matchstem and the matchbook socket.

According to a stipulation of expected testimony by the manager of the Post Exchange at Fort Ord, an average of four thousand boxes, each containing twenty books of matches like the book taken from Taylor, were sold every month by the Post Exchange at the Fort. Browning testified that he subjected the matchstem and the sockets of the book of matches taken from Taylor to stereoscopic examination, with magnification of about forty to fifty times. He found that half the matchstem in issue was "obliterated" and could not be used as a basis for comparison, but the other half had irregularities which "matched perfectly" with the corresponding side of the socket. Even with this degree of correspondence, however, Browning admitted he "couldn't make a definite

44

opinion as to whether or not it [the stem] did or did not come from" a socket of the matchbook taken from Taylor. He admitted that under laboratory "policy" he could not make a "positive identification" "unless all irregularities match."

Guilt cannot be "determined by the odds." People v Collins, 66 Cal Rptr 497, 438 P2d 33 (1968). A fifty percent correspondence too insufficient to allow an expert in the discipline to make a "positive identification" is, in our view, also insufficient to establish beyond a reasonable doubt, in opposition to affirmative and unqualified eyewitness testimony, that Taylor was in the CO's office. See Tribe, "Trial by Mathematics: Precision and Ritual in the Legal Process," 84 Harvard Law Review 1329 (1971). One can speculate as to how Taylor got the paint on his boot, but that speculation does not constitute a compelling inference justifying disregard of Timmons' testimony that Taylor never left the orderly room during the period of time that the Government postulated as that within which the fire was set. We conclude, therefore, that the evidence against Taylor is insufficient to support his conviction for arson.

### AS TO HARVEY

Without attempting a detailed discussion of the point, it may fairly be inferred that Harvey was ▮ not, like Lee and Taylor, so completely within Timmons' sight or direct hearing as to generate by itself a reasonable doubt that he did not have an opportunity to enter the CO's office. The fact that he had an opportunity for access does not of course equate, as the Government argues, to evidence that he did.

Presence at a particular place can properly be established by circumstantial as well as direct evidence. United States v Domenech, 18 USCMA 314, 317, 40 CMR 26 (1969).[3] The Government contends that compelling circumstantial evidence exists in Browning's testimony as to the gross similarity between the paint on Harvey's boot and the paint on the floor of the CO's office. That testimony is not the whole of the matter.

Browning admitted that his conclusion of gross similarity did not mean that the paint spots were "identical" because the paint could have come from other cans made from the same manufacturer's batch of paint. He also admitted that, as a Government specified item, paint with the same formula would in "color and color texture generally . . . be very close."

As a witness for Harvey, Sergeant Dickson testified that Harvey was on a paint detail. During the week of the fire for "three days in a row" the detail painted a "blue border up around the wall" in the orderly room with a brush. Two or three days before the fire, Dickson told Harvey to "get the paint" off his boots. Dickson saw the blue paint, mixed with water, on the floor of the CO's office. According to him, "it looked to be darker" than the paint used by Harvey's detail, but he admitted "it could have been from the water, fire, anything." It also appears from the Government's photographic exhibit that the paint spots on Harvey's boot, marked for identification by Browning, were formed by droplets rather than by the spray of an aerosol can.

Whether the evidence as to the difference in source of the paint and the character of the spots is sufficient to create a reasonable doubt that Harvey got the paint on his boot from the spray can in the orderly room need not detain us. We may assume that the paint on the boot came from the can.

---

[3] Strangely, Malone, who apparently was the one person in the orderly room with Harvey all the time, was not called as a witness. Since there is no evidence to indicate that he was especially available to the Government or Harvey, no inference can properly be drawn from the failure to present him as a witness. See United States v White, 17 USCMA 211, 214, 38 CMR 9 (1967).

However, as we indicated in regard to Lee and Taylor, that circumstance does not establish beyond a reasonable doubt that Harvey went into the CO's office. In fact, the evidence provides a reasonable basis from which to conclude that if Harvey used the can its use was for an innocent purpose.

It will be recalled that Rountree picked up the can when he was "kidding around" with Timmons. There is evidence to indicate that Harvey was somewhat similarly engaged with Malone. Since the can was left at the table top he could easily have picked it up, taken it with him into the training room where he was with Malone, and there used the can, returning it to the clerk's desk rather than the table because it was closer to the training room. We do not, of course, suggest that this is what actually happened, but it is a matter for consideration. Piecemeal, no one item of evidence favorable to Harvey may be sufficient to create a reasonable doubt of his guilt. All the items together, however, leave us with substantial doubt that he painted the words on the floor of the CO's office and set fire to the paper on the bookcase as the Government charged. We conclude, therefore, that his conviction for arson cannot stand.

We turn now to the charge against Taylor for violating a regulation. Staff Sergeant Turner testified that he saw Taylor in the company area with a paper bag. The "imprint" of the contents "resembled beer" which he knew was prohibited in the company area; accordingly, he asked Taylor " '[w]hat's in the bag?' " Taylor replied that it contained wine; whereupon Turner looked into the bag and discovered two bottles of wine.

At trial, Taylor's counsel objected to the admissibility of the reply to Turner's question. Trial counsel argued that the statement was admissible because it was "an extemporaneous" remark, one "which the accused himself blurted out." However, the trial judge admitted the statement because it was the product of a "chance meeting," not within the "custodial situation contemplated by Article 31" of the Uniform Code. Both reasons are wrong.

Turner was a platoon sergeant with superior rank and position over the accused. His question to the ■ accused was conceived as part of his official duty and he manifestly believed the accused had to answer, even though suspected of misconduct. See United States v Tharp, 11 USCMA 467, 29 CMR 283 (1960); cf. United States v Cross, 14 USCMA 660, 34 CMR 440 (1964). Taylor's reply simply cannot be construed as spontaneously volunteered information. See United States v Workman, 15 USCMA 228, 35 CMR 200 (1965). As to the trial judge's reason, it is apparent he was confused as to the scope of Article 31. Under that Article, the necessity to advise a person suspected of misconduct under the Uniform Code of the right to remain silent does not depend upon whether the interrogator's encounter with the suspect occurs by chance or results from custody. The judge's misconception of Article 31 would itself require reversal of Taylor's conviction. United States v Berry, 6 USCMA 609, 613-614, 20 CMR 325 (1956). However, since the evidence leaves no doubt that advice as to the right to remain silent in the circumstances of the case was required and no advice was given, Taylor's statement was inadmissible. The record further indicates that there is no substitute evidence which would justify further proceedings.

The decision of the Court of Military Review is reversed. The findings of guilty and the sentence as to each accused are set aside and the respective charges against each accused are ordered dismissed.

Chief Judge DARDEN and Senior Judge FERGUSON concur.

**Key**

W-1st Sgt's Desk T-2 Window
Z-Clerks' desks (2) T-3 Paint on floor
Y-Table V-1 Window