**UNITED STATES, Appellee,**

v.

**Andrew R. SEAY, Sr., Specialist Four, U. S. Army, Appellant.**

No. 29,600.

U. S. Court of Military Appeals.

Nov. 7, 1975.

*Colonel Victor A. DeFiori, Major James Kucera, Captain John R. Osgood, Captain Robert D. Jones,* and *Captain Allan L. Placke* were on the pleadings for Appellant, Accused.

*Lieutenant Colonel Ronald M. Holdaway, Captain Richard S. Kleager,* and *Captain Gregory M. Van Doren* were on the pleadings for Appellee, United States.

## OPINION

FLETCHER, Chief Judge:

After receiving several inquiries from the local post exchange concerning checks of Specialist Seay which had been returned for insufficient funds, Captain Knauer in his capacity as troop commander "informally" counseled the accused with regard to his "moral and legal [obligation] to take care of his bad checks." Only after the third such session did Captain Knauer finally advise the accused of his rights under Article 31(b), Uniform Code of Military Justice, 10 U.S.C. § 831(b).

Although he admitted suspecting the accused of a criminal offense and acknowledged questioning Specialist Seay in his official capacity during the "informal" sessions, Captain Knauer maintained that he did not ask incriminating questions, nor did the accused provide incriminating responses.

When cross-examined further as to the specifics of his unwarned inquiries, Captain Knauer admitted telling the accused "that he had some bad checks over at the PX and that he should go over and take care of the matter." Captain Knauer also acknowledged that Specialist Seay agreed to "take care of" the checks, a statement which the captain interpreted as implying that the accused had written the checks.

As the number of bogus checks written by Specialist Seay continued to escalate, Captain Knauer again counseled the accused, but on this occasion he "formally" warned him of his rights. Specialist Seay's subsequent admission that the checks "were written by him, and it was his signature" provided the Government with its primary evidence of authorship in subsequently

prosecuting the accused for uttering 18 worthless checks with intent to defraud.[1]

In receiving the accused's admission into evidence over defense objection, the trial judge ruled that, even though Captain Knauer violated Article 31 by "informally" questioning Specialist Seay without first warning him, the accused's subsequent admission "was made voluntarily and [was] not tainted by any prior admissible [sic] statements."

I

Government counsel urge affirmance of the trial judge's ruling on either of two theories. Pointing to paragraph 3–1c, Army Regulation 600–15 (Feb. 11, 1970), the Government first asserts that we need not address the taint question since the trial judge erroneously ruled that the "informal" questioning of Specialist Seay was barred by Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831.[2] In pertinent part, that regulation requires a commanding officer to interview any member of his command after notification of an outstanding debt to inform the individual of the complaint as well as to instruct him as to his rights and responsibilities. Urging that the troop commander acted properly in counseling the accused as he did, government counsel suggest that an Article 31 warning preceding such an interview "would both unnecessarily alarm the soldier and obfuscate the real purpose of the interview."

The position advanced by government counsel on both the effect and appropriate interpretation of the regulation contains a fallacious premise in assuming that the regulation should be accorded precedence over the statute if in conflict with Article 31 of the Code. As is true with conflicting Manual provisions, a regulation which flies in the face of a statutory pronouncement must be overturned. *United States v. Greer,* 3 U.S.C.M.A. 576, 13 C.M.R. 132 (1953).

---

1. The trial judge found the accused guilty of 17 of the 18 charges.

2. Reexamination of a trial judge's ruling which is relied upon as a foundation to establish that

subsequently admitted evidence is tainted has been sanctioned previously by the Court. *E. g., United States v. DeLeon,* 5 U.S.C.M.A. 747, 756–57, 19 C.M.R. 43, 52–53 (1955).

Wherever possible, however, a regulation should be interpreted in a manner which accords with existing statutory law. *United States v. Jacoby*, 11 U.S.C.M.A. 428, 29 C.M.R. 244 (1960).

■ The regulation in question is not controlling in disposing of the question before us for it merely directs commanders to *advise* soldiers of their rights and obligations rather than requiring commanders to *question* those concerned. To the extent that the regulation's use of the term "review" implies a questioning of an individual, the regulation must be read in conjunction with Article 31, UCMJ, 10 U.S.C. § 831. Irrespective of whether an Article 31 warning may have alarmed the appellant or obfuscated the purpose of the interview, a warning was still required since the commander acting in his official capacity[3] sought to question the appellant whom he suspected of a criminal offense. *United States v. Woods*, 22 U.S.C.M.A. 369, 47 C.M.R. 124 (1973); *United States v. Harvey*, 21 U.S.C.M.A. 39, 44 C.M.R. 93 (1971); *United States v. Murphy*, 14 U.S.C.M.A. 535, 34 C.M.R. 315 (1964).[4]

## II

Government counsel also contend that, even assuming the "informal" questioning sessions required an Article 31 warning, the subsequent confession made by appellant after being properly warned of his right to remain silent and his right to counsel was voluntary.

In *United States v. Hundley*, 21 U.S.C. M.A. 320, 325, 45 C.M.R. 94, 99 (1972), we reiterated the well-settled evidentiary standard[5] governing the admission of such statements:

If the Government secures admissions without full compliance with the law and the admissions are a kind likely to produce a later confession, convincing evidence must exist that a later warning severed the presumptive influence of the first statement on the later one. *United States v. Bennett*, 7 U.S.C.M.A. 97, 21 C.M.R. 223 (1956).

Similarly, in *United States v. Foecking*, 22 U.S.C.M.A. 46, 48, 46 C.M.R. 46, 48 (1972), we stressed that "[t]o the extent that some evidence indicates the statement was 'the likely product of other evidence which was illegally obtained, the Government has a heavier burden than in a case in which the statement stands apart from any such possible taint.'" *Accord, United States v. Spero*, 8 U.S.C.M.A. 110, 113, 23 C.M.R. 334, 337 (1957). *See also United States v. Heslet*, 23 U.S.C.M.A. 88, 48 C.M.R. 596 (1974).

In attempting to avoid an inelastic application of these concepts, we observed in *United States v. Wimberley*, 16 U.S.C.M.A. 3, 9, 36 C.M.R. 159, 165 (1966), that "[w]here there are successive statements, it is not a

---

3. The contention that Captain Knauer was acting in an unofficial capacity in questioning appellant is belied not only by the witness' testimony at trial but also by government counsel's own argument on appeal in which they assert that Army Regulation 600–15 obligated the commander to question appellant as part of his official duties. *Cf. United States v. Carlisle*, 22 U.S.C.M.A. 564, 48 C.M.R. 71 (1973); *United States v. Dandaneau*, 5 U.S.C.M.A. 462, 18 C.M.R. 86 (1955).

4. *See generally* Moyer, Justice and the Military §§ 2-200—2-219 (1972); Hansen, *Miranda and the Military Development of a Constitutional Right*, 42 Mil.L.Rev. 55 (1968).

5. We note that the Supreme Court refined a similar rule in *Clewis v. Texas*, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967), shortly after announcement of the *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), standard. Since 1968, it has been unnecessary for the Court to again restate the principle. Military practice, on the other hand, continues to evidence a disturbing reluctance to accept and to properly apply the voluntariness test enunciated by the Supreme Court and adopted by this Court. *See, e. g., United States v. Heslet*, 23 U.S.C.M.A. 88, 48 C.M.R. 596 (1974); *United States v. Troy*, 22 U.S.C.M.A. 195, 46 C.M.R. 195 (1973); *United States v. Pyatt*, 22 U.S.C.M.A. 84, 46 C.M.R. 84 (1972); *United States v. Hundley*, 21 U.S.C.M.A. 320, 45 C.M.R. 94 (1972). As was succinctly stated by the Supreme Court, quoting *Reck v. Pate*, 367 U.S. 433, 442, 81 S.Ct. 1541, 1547, 6 L.Ed.2d 948 (1961), a "constitutional inquiry into the issue of voluntariness 'requires more than a mere color-matching of cases.'"

precondition to the admission of a properly obtained statement that the accused be informed that a previous statement cannot be used against him." *See also United States v. Monge*, 1 U.S.C.M.A. 95, 2 C.M.R. 1 (1952). Instead, the existence of an improper statement must be considered together with the surrounding circumstances in determining whether the former statement tainted the latter. *United States v. Powell*, 13 U.S.C.M.A. 364, 32 C.M.R. 364 (1962).

Among the factors to be weighed in resolving whether the presumptive taint of the former interrogation has been overcome are the time lapse between the questioning periods, whether the accused was again questioned by the individual who obtained the prior inadmissible statement, whether the accused himself made an acknowledgement that his prior admissions did not influence his decision to incriminate himself again, and whether the interrogator relied upon the prior admissions in seeking a subsequent statement.

In application, only the strongest combination of these factors would be sufficient to overcome the presumptive taint which attaches once the Government improperly has secured incriminating statements or other evidence. *United States v. Wimberley, supra*. In addition to rewarning the accused, the preferable course in seeking an additional statement would include advice that prior illegal admissions or other improperly obtained evidence which incriminated the accused cannot be used against him.[6]

▮ Turning to the facts before us, the record indicates that the accused was counseled by the same individual concerning the same course of conduct on four occasions during a relatively brief time frame.[7] Can it be said that the last incriminating statement was insulated from the effect of all that went before? *Clewis v. Texas*, 386

U.S. 707, 710, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967). Stated somewhat differently, was there a break in the stream of events sufficient to conclude that the giving of the final statement was uninfluenced by the events which had preceded it? *Darwin v. Connecticut*, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968). We think not.

Nothing in the testimony of Captain Knauer indicates that he sought to insulate the final counseling session from the ones which had preceded it. In fact, the Government has relied upon the effect of the prior sessions on the accused in urging that a more detailed explanation of the nature of the offense was unnecessary during the "formal" interrogation. We conclude, therefore, that the trial judge prejudicially erred in admitting the tainted confession into evidence over defense objection. *United States v. Hall*, 23 U.S.C.M.A. 549, 50 C.M.R. 720, 1 M.J. 162 (1975).

The decision of the U. S. Army Court of Military Review is reversed. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

COOK, Judge (concurring in the result):

I perceive the relationship between the troop commander and the accused, and the effect of Army Regulation 600–15 upon that relationship, differently from my brothers.

First and foremost the troop commander is a military leader charged with responsibility to carry out a major Government function, in an atmosphere that "insist[s] upon . . . a discipline without counterpart in civilian life." *Schlesinger v. Councilman*, 420 U.S. 738, 757, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591 (1975). I cannot conceive that Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831, requires that every time he talks to a subordinate about

---

**6.** An obvious dilemma arises where, as here, the questioner, himself, does not know that the *prior statements* were illegally obtained. In providing a second incriminating statement, the accused, of course, was operating under a similar handicap.

**7.** The last "informal" counseling session occurred on approximately May 7, 1973. The "formal" session transpired "sometime [thereafter] in May," according to Captain Knauer's testimony.

an apparent lapse of performance of duty or conduct as a member of the armed forces he must first warn the subordinate of the right to remain silent. This Court expressly rejected that view of Article 31 in *United States v. Haskins*, 11 U.S.C.M.A. 365, 369, 29 C.M.R. 181, 185 (1960). There, the Court held that not every suspicion entertained by a commander as impropriety of conduct by a subordinate triggers an obligation on his part to warn the subordinate of the right to remain silent under Article 31 before he can discuss that conduct with the subordinate. The Court emphasized that "the sort of suspicion which Congress had in mind" was one which had "crystallized to such an extent that a general accusation of some recognizable crime . . . [could] he framed." In line with *Haskins*, I do not believe that when a commander calls in a member of his command to counsel him in accordance with AR 600–15 this action comes within the proscription of Article 31. In fact, to require him to first advise the person to be counseled of the right to remain silent would tend not only to "unnecessarily alarm" the individual, as the Government maintains, but to defeat the purpose of the counseling.

While I would accord much greater latitude to the commander when exercising his leadership and command responsibilities in situations of the kind present here than my brothers allow, I join in their conclusion that the statements in issue were inadmissible against the accused. The purpose of the counseling provided for by the regulation and the manner of its effectuation are calculated to encourage free and full discussion of the matter.[8] The entire arrangement impresses me as implying a promise to the individual that whatever he might say during the counseling session, those statements would be used only as a basis for preparing a reply by the commander to the

individual's creditor, not as a basis for criminal prosecution. In this regard, the case is comparable to *United States v. Haynes*, 9 U.S.C.M.A. 792, 27 C.M.R. 60 (1958).

■ In *Haynes*, during the course of a polygraph examination incident to obtaining a higher security clearance for a new assignment, the accused made an inculpatory statement, including disclosure of the names of persons who could testify to the criminal conduct. Preliminary to the examination, he had been informed that anything he said would be "treated with the highest degree of confidence" and not made the subject of a court-martial prosecution. This Court held that because of the promised confidentiality, the statement itself would have been inadmissible and, resultantly, the testimony of the witnesses was tainted and inadmissible.[9] I conclude, therefore, that accused's statements to the troop commander during the several counseling sessions were properly determined to be inadmissible by the trial judge. Although the statements admitted into evidence were made later, I agree they are sufficiently linked in subject matter, circumstances, and persons to fall within the proscription of evidence obtained through exploitation of other inadmissible evidence. For these reasons, I join in the result reached by my brothers and in the disposition directed in the principal opinion.

FERGUSON, Senior Judge (concurring in the result):

I would apply the literal language of Article 31. No plainer nor clearer language may be imagined than "[n]o person subject to this chapter . . . ." With the sole noteworthy exception of this introductory phrase of this proscriptive article, we never have hesitated to apply the clear and plain

---

**8.** The regulation plainly contemplates a personal interview with the debtor and procurement of a statement from him which would not only acknowledge or deny the obligation, paragraphs 3–1c(3) and (4), but also disclose the individual's "overall financial situation throughout the life of the obligation" and his "intentions regarding payment."

**9.** *See also United States v. Green*, 15 U.S.C.M.A. 300, 35 C.M.R. 272 (1965), in which the Court held that a promise of confidentiality made by a competent person that would render a statement inadmissible against the declarant can be implied from the circumstances.

meaning of a statutory or Manual [10] provision [11] and the perpetuation of this deviation is in my estimation unwarranted.

This Court's mandate is to apply and, when necessary, to interpret the law, not to ignore statutory language which lends itself to but one meaning. Furthermore, the reason for this broad literal proscription imposed by Congress is illustrated by the case at bar. In the military, unlike civilian society, the exact relationship at any given moment between the ordinary soldier and other service personnel in authority (i. e., commissioned and noncommissioned officers) often is unclear. In the civilian experience, it is unlikely that anyone to whom *Miranda* [12] might apply would question someone else other than in the former's official capacity—that is, as a law enforcement officer. However, in the military a company commander may advise or question a member of his command for any of a number of different legitimate reasons, only one of which might relate to a criminal offense. Thus, to simplify matters, and in recognition of the superior/subordinate atmosphere inherent in the military not present in the civilian structure, the requirement is broader in the former than in the latter.

■ Ever since this Court, in interpreting the broad and literal language of Article 31, determined that it ought not be given its clear and plain meaning, we have seen in repeated instances the difficulty the military seems to have in applying a more narrow proscription such as the "official capacity" standard. Whether that difficulty stems from a deficiency on the part of this Court in making clear the standard or from a resistance of sort on the part of those in the military who must apply it on the scene, is arguable. Whatever the causation giving rise to them, these cases serve to illustrate the wisdom of the Congress in removing from consideration such irrelevant factors as whether the questioner did or did not ask his questions in an official capacity. Thus, when *any* person subject to the Uniform Code of Military Justice questions a person suspected or accused of a violation of the Code without first advising him of his pertinent rights, he has thereby violated Article 31 and any further inquiry is immaterial to the legal conclusion of inadmissibility of the result of such interrogation.

■ Therefore, since a literal application of Article 31 will exclude the early statements and since I agree with the Chief Judge that the subsequent admission was tainted by those preceding, I concur with my brothers in the required disposition, but for the reasons stated, I am compelled otherwise to withhold my concurrence.

10. Manual for Courts-Martial, United States, 1969 (Rev.).

11. *See, e. g., United States v. Sosville*, 22 U.S. C.M.A. 317, 46 C.M.R. 317 (1973); *United States v. Jordan*, 22 U.S.C.M.A. 164, 46 C.M.R. 164 (1973); *United States v. Thomas*, 13 U.S.C. M.A. 278, 32 C.M.R. 278 (1962); *United States v. Davis*, 12 U.S.C.M.A. 576, 31 C.M.R. 162 (1961); *United States v. Hardy*, 11 U.S.C.M.A. 487, 29 C.M.R. 303 (1960); *United States v. Price*, 7 U.S.C.M.A. 590, 23 C.M.R. 54 (1957);

*United States v. Leach*, 7 U.S.C.M.A. 388, 22 C.M.R. 178 (1956); *United States v. Dickenson*, 6 U.S.C.M.A. 438, 20 C.M.R. 154 (1955); *United States v. Williams*, 4 U.S.C.M.A. 241, 15 C.M.R. 241 (1954); *United States v. Benson*, 3 U.S.C. M.A. 351, 12 C.M.R. 107 (1953); *United States v. Williams*, 2 U.S.C.M.A. 430, 9 C.M.R. 60 (1953); *United States v. Lucas*, 1 U.S.C.M.A. 19, 1 C.M.R. 19 (1951).

12. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).