UNITED STATES, Appellee,

v.

Charles W. ELMORE, Boatswain's Mate
Third Class, U.S. Navy, Appellant.

No. 65524.

NMCM 88 4769.

U.S. Court of Military Appeals.

Argued Aug. 1, 1991.

Decided Sept. 30, 1991.

For Appellant: *Jack B. Zimmermann, Esq.* (argued); *Captain Michael K. Schaller, USMC* (on brief).

For Appellee: *Lieutenant Timothy S. Susanin, JAGC, USNR* (argued); *Commander Thomas W. Osborne, JAGC, USN* (on brief); *Lieutenant William R. Sprance, JAGC, USNR.*

*Opinion of the Court*

COX, Judge:

Appellant stands convicted, contrary to his pleas, of a single specification of premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918.[1] We granted review of four issues.[2] We resolve all of them against appellant.

---

1. The Charge was referred as noncapital. Appellant was sentenced to a dishonorable discharge, confinement for life, total forfeitures, and reduction to E-1. The convening authority approved the sentence, and the Court of Military Review affirmed. 31 MJ 678 (1990).

2.

I

WERE APPELLANT'S RIGHTS TO CONFRONTATION OF WITNESSES, DUE PROCESS OF LAW, AND A FAIR TRIAL VIOLATED WHEN A CRUCIAL PROSECUTION EXPERT WITNESS IMPROPERLY ENGAGED IN CONVERSATION AND DINED WITH THE MEMBERS OF THE COURT THE FIRST NIGHT OF TRIAL AND ATE BREAKFAST WITH THEM THE SECOND DAY OF TRIAL?

II

WERE APPELLANT'S RIGHTS TO CONFRONTATION OF WITNESSES, DUE PROCESS OF LAW, AND A FAIR TRIAL VIOLATED WHEN THE MILITARY JUDGE ADMITTED HEARSAY EVIDENCE OF ORAL STATEMENTS PURPORTEDLY MADE BY THE ALLEGED VICTIM?

III

SHOULD THE FINDINGS OF GUILTY BE SET ASIDE BECAUSE THE EVIDENCE WAS LE-

## I

We first take up granted issue III, wherein appellant challenges the sufficiency of evidence of his guilt. Our review is limited to testing *legal* sufficiency, Art. 67(c), UCMJ, 10 USC § 867(c) (1989). As the Supreme Court has noted:

Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

*Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (footnote omitted).

■ Our standard then is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Id.*

■ The Court of Military Review has set out the facts quite comprehensively, as follows:

Boatswain's Mate Third Class (BM3) Elmore was a member of the station boat crew at Naval Station Harold E. Holt, when he was convicted of murdering his wife, Bella, a Filipino, at Exmouth, Australia, during the early morning hours of 17 March 1988. Appellant and Bella had lived together for 3 years and had been married for 6 months in March 1988. At trial the evidence revealed that the appellant and his wife had constant arguments over money and a history of relatively minor mutual spousal abuse. The testimony included statements Bella made to her friends concerning her dissatisfaction with the marriage, maltreatment by appellant, threats by him to harm her, and fears for her personal safety comprising

... hearsay statements objected to by the defense.... The testimony also included statements appellant had expressed to Michael and Stephanie Parsons, his best friends, that he wanted to divorce Bella, and that his marriage to her was a mistake. While drunk, he had "jokingly stated" to Michael Parsons, on several different occasions, that he "wanted to cut Bella up and use her for shark bait." The Parsons testified about a specific instance where appellant struck Bella, which caused a lump to raise on her head and blood to come from her mouth. Further, appellant and Bella had had a particularly vocal, crude, and public argument at the enlisted club on 4 March. Finally, a Chief Tope, who drove appellant home the night of the 4 March argument, testified that appellant was upset, cried, and stated that his marriage was over because Bella was off "f... someone else."

On the evening of 16 March, appellant and his wife, with their friends, bowled and then went to the enlisted club for drinks. After drinking heavily, appellant and Bella were seen to leave the club together. Appellant later told the police authorities that he and Bella had returned home around 2300. Appellant has told no less than four different stories as to what happened later that night. In version 1, which appellant told over the next two days to the Parsons, his division officer LT Sullivan, Petty Officer Smith, and Australian police authorities, he stated that he went to bed upon returning home and that Bella was gone when he awakened at 0530 the next morning, 17 March 1988. In version 2 appellant stated that he and his wife returned home that evening, argued heatedly over money, and decided to go for a drive to help resolve their differences. After stopping the car (the only white hatchback Ford Mustang in Western Australia) off-base, Bella got out of

GALLY INSUFFICIENT TO SUSTAIN FINDINGS OF GUILTY?

IV

WAS APPELLANT'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE

SIXTH AMENDMENT VIOLATED WHEN HIS FOREIGN CIVILIAN DEFENSE COUNSEL FAILED TO OBJECT TO THE ADMISSION OF DAMAGING HEARSAY STATEMENTS AND SPECIFIC INSTANCES OF MISCONDUCT?

the car to walk. Appellant drove off leaving his wife but later picked her up. They then drove to the Navy pier, 10 miles from their house. Appellant stated that upon arriving at the pier between 0100 and 0130 they continued to argue. Appellant, agitated, left Bella at the pier and returned home. Appellant stated that he next saw Bella later that morning while he and Parsons were driving to work, though he neither told Parsons of leaving Bella at the pier nor did he stop to pick her up. When Detective Sergeant Balchin questioned appellant concerning this version, appellant recanted and told version 3, that is, he and Bella entered the boathouse near the pier to get something to drink, continued to argue, whereupon appellant told her to take her belongings and leave their house. Bella then walked the nearly one-fourth of a mile length of the pier, headed to the northwest corner of the pier to a point where there was a gap in the rail. Appellant followed her and as he approached her, called to her and she either tripped or stumbled, and fell off or over the pier railing into the Gulf of Exmouth, where tides were running at 5–6 knots heading out toward the Indian Ocean and the water is 45 feet deep. He went home, went to bed, got up the next morning and went to PT formation. The 4th version is appellant's trial testimony, which embellishes the 3rd version. Appellant testified that after arriving at the boathouse, he and Bella returned to his car and drove several miles to the lighthouse, where they talked for 2 hours, then returned to the pier. He testified that after Bella fell into the water, he spent between 30 to 45 minutes searching the area around the pier and the catwalks beneath it. He also testified that the pier was well lighted at night, he never used the emergency phone on the end of the pier to call for assistance, admitted to never throwing a life buoy to assist her (because he states he never saw her), and not finding her, returned home, went to bed, awakened the next morning and went to work. He stated to

Detective Sergeant Balchin, and testified, that he thought Bella could swim to shore and walk barefooted the 10 miles back to their house.

It was not until the following afternoon that appellant began to search for Bella, going first to the Parsons' home, and then to several other of Bella's friends' houses, asking if they had seen her because when he had wakened that morning he found she was gone. (Appellant explained that he made inquiries about her disappearance with her friends because Bella had previously spent the night at the houses of friends when she and appellant were not getting along.) From 18–27 March, appellant denied knowledge of Bella's whereabouts, and participated in searches for her in the area surrounding his house. On 19 March, while various people were searching the areas immediately adjacent to his house, he borrowed the 4-wheel drive vehicle of UT2 Kanachki and drove to the beach area, looking for Bella. He took no one with him and told no one what he was going to do. It was not until questioned by Detective Sergeant Balchin on 27 March that he recanted his original story (version 1) concerning Bella's disappearance.

The evidence of record reveals that as of the date of trial Bella Elmore had not been seen by appellant or their friends since the evening of 16 March 1988. No body or traces thereof had been found. Also proven was the fact that Bella had not been listed as a passenger on the passenger manifests of the Australian bus company or airlines, nor at the Military Airlift Command terminal. Although an identification card is not required for domestic transportation, employees of the bus and airline terminals testified they did not remember seeing her or anyone resembling her after 16 March. Finally, the victim's military dependent identification card and resident alien card were found in the Elmore

home and appellant gave the police her passport.

31 MJ 678, 681–83 (1990).

In addition, the court noted that

Shorts identified by Bella's best friend as belonging to Bella were found at the beach near the pier. A bedspread identified as one similar to one owned by the Elmore's was also found at the beach near the pier. Appellant's car was seen heading off-base, toward the pier after 0330 of the morning in question. Testimony from a fellow diver was that no one could have swum to the beach in those currents from the end of the pier that night.[3] Appellant's auto and house were both cleaned thoroughly immediately after Bella's disappearance, which was unusual as testimony was that both were generally a mess. Further, all of Bella's identification, including passport, military dependant identification card, working permits and the rest of her clothes and jewelry, were found in the Elmore home during a permissive search.

31 MJ at 684.

Further, the court recited:

Bella's blood type was A positive. This type of blood was found on the sheets and mattress pad at their house, and the Government's expert testimony, hotly disputed by the defense expert, was that this blood was venous or peripheral blood, and not menstrual blood, as its position and pattern on the sheets and mattress pad would indicate. [*See infra.*] It also was present on a knife used for the cleaning and cutting of fish owned by appellant. A pair of stained blue shorts washed up on the beach within days of Bella's disappearance, were positively identified by two of Bella's friends as hers, but had been washed by their finder, so no blood-type identification of the stains was possible.[4] The bedspread, washed up on the beach approximately 6 kilometers from the pier about a month later and identified by Maria Pryor as belonging to the Elmore's, had been saturated with blood, notwithstanding that any conclusive analysis as to the type or "humanness" of the blood was possible [sic] due to its exposure to the elements.

*Id.* at 684.

The Government's theory of the case was that appellant murdered Bella by stabbing her with his fishing knife, wrapping her body up in the bedspread, and driving to the pier, where he tossed her body into the shark-infested waters. On the foregoing facts, the court members found appellant guilty, beyond a reasonable doubt, of the premeditated murder of his wife. The Court of Military Review, exercising its independent factual and legal review powers, Art. 66(c), UCMJ, 10 USC § 866(c), declared itself

legally and factually convinced beyond any reasonable doubt that the appellant murdered his wife, Bella Elmore, and is guilty of the offense of which he was convicted.

31 MJ at 685.

Article 118(1) of the Uniform Code denounces premeditated murder in these terms:

Any person subject to this chapter who, without justification or excuse, unlawfully kills a human being, when he ... has a premeditated design to kill[,] ... is guilty of murder....

The Manual for Courts–Martial, United States, 1984, further identifies these elements of premeditated murder:

(a) That a certain named or described person is dead;

(b) That the death resulted from the act or omission of the accused;

(c) That the killing was unlawful; and

(d) That, at the time of the killing, the accused had a premeditated design to kill.

Para. 43b(1), Part IV.

Certainly there is no requirement that the prosecution produce a body, especially

---

3. Appellant was also a diver and knowledgeable of the water conditions.

4. The finder did not realize the possible connection to the offense until after the shorts had been washed.

when it appears that the accused has gone to such lengths to make that physically impossible. Like the court below, we are persuaded by the overwhelming circumstantial evidence that *"any* rational trier of fact [w]ould have found the essential elements of the crime beyond a reasonable doubt." *See Jackson v. Virginia,* 443 U.S. at 319, 99 S.Ct. at 2789. Under this standard, the evidence of record is legally sufficient to sustain the findings of guilt in this case.

## II

■ Next, we take up granted issue I, which concerns the alleged "bolstering of the key government witness by his out-of-court contact with the members." The witness was David F. Werner, a forensic serologist who worked at the U.S. Army Criminal Investigation Laboratory, Fort Gillem, Georgia. Werner tested numerous items submitted by the Government for the presence and type of blood. He was one of three experts who testified at the court-martial concerning blood.

In order to avoid exposure of the membership to pretrial publicity, all members had been brought in from remote commands. Because Exmouth was a small town with limited public accommodations, it happened that Werner and the court members were all billeted at the same hotel. Again, we defer on the facts to the following summary by the Court of Military Review:

> Mr. Werner, the Government expert witness who testified at trial concerning the presence and type of blood stains on various items, had dinner with the members of the panel the night of 25 July. That date was the first day of trial with the court assembled. The members, when *voir dired* individually on the communications, were not as one with their answers, but when taken in the light most favorable to appellant, stated that Mr. Werner told them he was a witness at the court-martial, that he was a CID agent who worked at the Army Crime Laboratory in Atlanta, had worked with the FBI on various cases, and testified at

> other courts-martial. These were not the exclusive topics of conversation, of course; but they were the topics that had any relevance for potentially prejudicing the appellant's case. To compound matters, Mr. Werner breakfasted with three of the members the next morning. Mr. Werner explained the next day that he sat with the members at dinner because the restaurant did not allow patrons to occupy a table by themselves. Mr. Werner testified that he did not realize he was dining with members, and they did not discuss the case. He also testified that he could not have said he worked with the FBI because he never had; but he might have made a comment to the effect that he had gone to school at the FBI Academy.

31 MJ at 688–89.

These contacts were reported to trial counsel shortly before *voir dire* of the members was to commence, and the matter was promptly reported to the military judge. The subject of these contacts, therefore, became a primary focus of individual *voir dire.* It quickly became clear from *voir dire,* however, that no information regarding the case was in any way mentioned to members. The defense contention then and now is that, due to this informal contact, the members would tend to give more credence to Werner's testimony than they might otherwise have.

In this regard, defense counsel asked each of the members about his general impression of the witness as a person. Not surprisingly, based on these limited contacts, no strong impressions seemed to have emerged. One member said:

> I guess my general impression was that he seemed to be just a rather negative individual, complaining about accommodations, travel, that sort of thing. But other than that, I had no impression of him.

Another member offered that "[h]e seemed [like a] relatively nice guy." According to another member:

> Well, he seemed friendly. He didn't volunteer any information about what he did and, in fact, I hadn't—when I sat down, I really didn't know what he—what his connection with the case was, as

a witness or—I thought perhaps he was one of the counsel....

Another member described him as

just an average individual. I didn't judge his intelligence or anything like that and we didn't talk about anything that would give you anything that would—like I said, all we were discussing were current events in the States.

Two other members had so little contact with Werner that they had no impression whatever.

The final member, Lieutenant Commander Griffin, when asked by defense counsel for his "general impressions of the man [Werner] .... [i]n terms of personality, intelligence level, anything like that[,]" responded:

Well, I don't know.... He seemed to be competent in his job. I don't know. He didn't—

To clarify that response, the military judge personally quizzed the member as follows:

Q. All right. Lieutenant Commander Griffin, what if anything did the witness tell you that would lead you to believe that he was competent in his job?

A. Only the number of cases that he indicated he had worked on and that he had apparently had been with the—at one point he did indicate that he had worked with the FBI on various cases and so forth.

Q. And from the fact that he had participated in several cases you deduced that he must be competent otherwise he wouldn't have participated in several cases?

A. Yes.

Q. Was there anything other than that that would lead you to draw any conclusions as to his competency or credibility?

A. No.

At the conclusion of *voir dire,* the defense challenged the array for cause based on the contact with Werner. The military judge denied the challenge with this rationale:

The challenge for cause of the array of the court members is denied. This Court could care less about the cost [of bringing in new members for the court-martial]. In fact, Lieutenant Blood [defense counsel], I want to ensure this case is only tried once. If there was any question, *any* question in my mind, I would rule to the contrary and I would rule the same if this case was tried in Pearl Harbor or if it's tried here.

It is often the case in courts-martial practice to have court members analyzing the testimony of people they know; people in the crew; people in the company. There are many cases where everyone knows everyone else, and even under those circumstances, there is no challenge for cause to the array unless there is some bias or prejudice or indicia of the prejudice. In this case, I am satisfied beyond any doubt that there has been no discussion of any issues relevant to this case. The one hour casual dinner conversation, in my judgment, just does not suffice to establish some kind of potential for prejudice.

Thereafter, the defense challenged one member (Lieutenant Anderson) for cause on the ground that he had been a civilian police officer prior to entering active duty in the Navy. The military judge, though satisfied that the lieutenant would have made "an excellent court member," excused him on the basis that "[c]hallenges for cause should be liberally granted...." No other members were challenged for cause. The defense next challenged Lieutenant Commander Griffin peremptorily. The court-martial proceeded with the remaining five members.

Both parties and the Court of Military Review agree that the standards to be applied here are those we adopted in *United States v. Adamiak,* 4 USCMA 412, 15 CMR 412 (1954). There we observed:

[T]he Supreme Court long ago proclaimed that "Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer

in charge, are absolutely forbidden, and invalidate the verdict, at least until their harmlessness is made to appear." *Mattox v. United States*, 146 U.S. 140 [13 S.Ct. 50, 36 L.Ed. 917 (1892) ]. As later cases make clear, in the Federal courts the presumption of prejudice arising from communications between jurors and a witness or other party is a rebuttable one; "but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." Ultimately the trial judge determines whether the Government has rebutted the presumption of prejudice. The presumption must be rebutted by a "clear and positive showing" that the improper communication from a third person or witness did not and could not operate in any way to influence the decision. Cf. *Baker v. Hudspeth*, 129 F.2d 779 (CA 10th Cir).

4 USCMA at 417–18, 15 CMR at 417–18 (some citations omitted).

■■■ We agree that this remains the standard. We also agree that the prompt and thorough investigation superintended by the military judge clearly established that the inadvertent contact between the witness and the court members did not in fact prejudice appellant or taint the proceedings in any way, appearances notwithstanding. We are confident that the court members were able to evaluate the testimony and opinions of the witness, Werner, without bias or predisposition. No one can ask for more. *Cf. Mu'Min v. Virginia,* —— U.S. ——, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991).

### III

Finally, we consider the remaining two issues in tandem. These concern admissibility of evidence of twelve specific statements or assertions by Mrs. Elmore, and defense counsel's failure to object to their admission.

*In limine*, defense counsel moved to suppress evidence of numerous statements allegedly made by Mrs. Elmore to her friends. The judge suppressed evidence of some of these statements. However, in view of the numerous theories of relevance which could potentially emerge on the merits, the judge declined, *in limine*, to suppress ten of these statements.[5] Essentially, these statements break down into three groups: that the victim was frightened of appellant and, in particular, frightened that he might kill her; that appellant had threatened to kill her in the past; and that he had physically abused her in various ways and even tried to kill her. *See* Appendix. While declining to suppress, the judge invited the defense to renew their objection on the merits if the Government attempted to introduce the statements, so he could rule with the benefit of a more specific context.

On the merits, the evidence pertinent to this question unfolded in this manner: First, the prosecution introduced appellant's extensive pretrial statements to Australian investigators, wherein he repeatedly characterized his relationship with Bella as harmonious. Then the Government produced witnesses who had personally observed that the Elmores' relationship was often volatile and acrimonious, witnesses who had seen the couples' abusiveness toward each other, both verbal and physical, and who knew that both appellant and the victim had expressed the desire to divorce. Specifically, these witnesses had heard appellant make threats against Bella's life and had seen examples of his violence toward her.

During cross-examination by the defense, one of these witnesses was asked nevertheless to "describe their [the Elmores'] degree of affection toward each other compared to other people." The witness responded, "Well, their affection toward each

---

**5.** Appellate defense counsel have subsequently identified two more statements received at trial

that they argue should have been suppressed.

other was a lot better than me and my husband's."[6]

After this witness was excused, trial counsel, in a session under Article 39(a), UCMJ, 10 USC § 839(a), signaled his intention to introduce the statements by Bella which had been the subject of the *in limine* motion. At this time, the military judge ruled—*and the defense agreed*—that the statements were admissible, not for the truth of the matters asserted, but to show the victim's state of mind, *i.e.* her fear of appellant, and to rebut the implication that the relationship was harmonious.

Accordingly, prior to presenting the witnesses who were to relate these statements, the military judge gave this on-the-spot instruction:

> Gentlemen, we're reaching the point in trial where you're going to be hearing numerous statements made by—or allegedly made by Bella Elmore to her friends regarding prior acts of violence to her. You are to consider this evidence for the limited purpose of establishing what her state of mind was—whether or not she feared the accused and as it went to their marital status. You may not consider the evidence for any other purpose and you may not conclude from the evidence that the accused is a bad person or has criminal tendencies and that, therefore, he committed the offense charged. Does each member of the court understand that instruction and how you are to consider this testimony?

The defense did not object to the instruction; and the witnesses then testified about the statements, *inter alia*.

The colloquy between the judge and counsel makes clear that it was not envisioned that the statements would be used by the members for the truth of the matters asserted. Rather, the following scenario seems to represent the understanding of the judge and the parties: One of appellant's versions had Bella simply falling off the pier as appellant approached. If believed, the factfinder would need to decide whether the fall was an accident, a suicide, an act of panic caused by appellant's ferocious approach, or had some other explanation. Thus, the victim's fear of appellant, if shown, was potentially relevant.

■ Additionally, it was agreed that, since the suggestion that the marital relationship was at least outwardly harmonious came from appellant's own mouth and from defense cross-examination of government witnesses (thus suggesting appellant was unlikely to have killed her), the *fact* that the victim was going around saying these awful things about appellant would, if believed, rebut the claim of a harmonious relationship.[7] For these reasons, the military judge ruled the statements admissible; and on these bases, the defense did not object.[8]

Before proceeding, it is useful to examine the apparent defense theory of the case. As indicated, the defense sought to portray the relationship as at least a tolerable one. Nevertheless, the defense was quite in agreement that both parties, at times, wanted to end the relationship. In part, the theory was that the Government had not proven that Bella Elmore is dead. Indeed, the defense produced two witnesses who said they had seen a woman resem-

---

6. Other government witnesses, on cross-examination by the defense, rated the marital relationship as normal.

7. In this posture, there is no confrontation problem. *See* U.S. Const. amend. VI. The event underlying the testimony was the fact of the victim's saying what she was saying; the witnesses to the event were present in court and testified as to their observations.

8. Although the judge, in his instructions, limited the use of the victim's statements to showing

"state of mind," "fear," and "as it went to their marital status," *and "for ... [no] other purpose"* (*see* text *supra;* emphasis added), it would have been better if he had gone on to emphasize that the statements specifically were not to be considered for the truth of the matter asserted. In view of the totality of the instructions given, however, we are satisfied that the court members understood how to use the evidence. In the absence of timely defense objection, the instructions were sufficient.

bling Bella Elmore, alive and well, after her supposed disappearance. Additionally, in one of appellant's versions of the events, he claimed seeing Bella the morning after she "fell" as he drove to work. Therefore, part of the defense strategy was to suggest that Mrs. Elmore somehow survived the night in question and simply ran away. In support of this theory, the defense itself elicited some of the testimony regarding the victim's genuine fear and dislike of appellant due to his abuse and mistreatment, resulting in her apparent determination to get away from him.

On appeal, the Court of Military Review concluded that the victim's statements were admissible. The court did not rely on the state-of-mind/fear rationale but, instead, found that the statements

> tend[ed] to rebut the description of the state of appellant's marriage as testified to by Bella's friend upon cross-examination by civilian defense counsel, who thus opened the door and acknowledged that the door was opened.

31 MJ at 686. In addition, the court held that the defense waived any objection it might have had to admission of the evidence by its ultimate failure to object, Mil. R.Evid. 103(a)(1), Manual, *supra;* and even if it "was error" to admit the statements, "the error was harmless." 31 MJ at 686 and 687.

Initially, we look to Mil.R.Evid 803(3)— *"Then existing mental, emotional, or physical condition."* This provision states:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> \* \* \*
>
> A statement of the *declarant's then existing state of mind, emotion, sensation, or physical condition* (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it

relates to the execution, revocation, identification, or terms of declarant's will. (Emphasis added.)

■ It is immediately clear from Mil.R. Evid. 803(3) that only a few of Mrs. Elmore's statements could have been received as hearsay exceptions under this rule, namely those statements reciting her fear of appellant. The other statements, those reciting his prior threats and assaults, are specifically not included under this exception. However, even those statements were offered only to show the victim's fear and for the *fact* of her uttering them. They were not "offered in evidence to prove the truth of the matter asserted"; thus, they were not hearsay. Mil.R.Evid. 801(c).

■ Inasmuch as the Court of Military Review did not embrace the state-of-mind relevance theory but, instead, grounded its holding on rebuttal of the harmonious-marriage claim, we also limit our review to the adequacy of that theory. The defense, of course, never asserted the victim's fear-of-appellant-at-the-end-of-the-pier as some sort of defense, and the prosecution's theory was that appellant drove the already-dead victim to the pier in the first place. Notwithstanding our self-imposed limitation, we agree that a military judge is not strictly limited to the theories advanced by the parties, but must instruct the court members on the legal points reasonably raised by the evidence. *E.g., United States v. Westmoreland,* 31 MJ 160 (CMA 1990), *cert. denied,* — U.S. —, 111 S.Ct. 966, 112 L.Ed.2d 1053 (1991). Furthermore, we recognize that, at the time of his ruling here, the military judge could not fairly be charged with omniscience in knowing exactly which theories would ultimately be pressed by the parties.

Appellant cites the case of *United States v. Brown,* 490 F.2d 758 (D.C.Cir.1973), as dispositive precedent. *Brown* was concerned with statements of the murder victim that he feared the accused would kill him. The Court of Appeals established specific limitations under which such statements could be received in evidence over

defense objection. *Id.* at 773–74. In principle, we have no disagreement with *Brown;* but like the Court of Military Review, we conclude that *Brown* is inapplicable to our analysis because we do not review that alternate theory of admissibility.

 That brings us to the Rules under which these statements must have been admitted *vel non.* Mil.R.Evid. 401 provides:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Mil.R.Evid. 402 provides that "[a]ll relevant evidence is admissible," with certain exceptions.

In one respect, we read the record of trial slightly differently from the military judge or the Court of Military Review. In our view, the status of appellant's marriage was in issue from the outset. The prosecution in its case-in-chief introduced considerable evidence from witnesses who personally observed appellant's abuse of, and contempt for, the victim. Clearly, this was received for the purpose of showing appellant's motive, intent, premeditation, etc., and the military judge so instructed the members. Mil.R.Evid. 404(b). Obviously, the Government did not set out to demonstrate the wretched state of the marriage for its own sake, but in the course of establishing motive, intent, premeditation, etc., the status of the marriage inevitably came sharply into focus.

The defense cross-examination appears to be more one of damage control. It sought to elicit testimony that the marriage was not entirely in shambles, but still retained a degree of affection—and certainly the marital condition was no incentive to murder. It was this that the Government was permitted to rebut. RCM 913(c)(1)(C). In our view, therefore, both parties thrust the state of this marriage into issue. Further, we agree that the mere fact that the victim was going about making all these terrible accusations against appellant, if believed, tended to rebut the relatively-harmonious-marriage stance taken by the defense. *Cf. Lock v. State,* 567 N.E.2d 1155 (Ind.1991). Thus, we agree that the government rebuttal evidence was relevant.

Even if relevant, of course, evidence is to be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Mil.R.Evid. 403.

However, the defense ultimately did not object to admission of the evidence on the bases proffered; and it appears that the military judge did not, at least expressly on the record, undertake the Mil.R.Evid. 403 balancing. Given the quantum of testimony received in evidence that was substantially similar to the victim's statements, it is difficult for us to conceive both (a) that her statements were so unduly prejudicial as to substantially outweigh their probativeness, and (b) that it was plain error for the judge to not, *sua sponte,* exclude them. In sum we conclude that the judge did not err in receiving the statements.

 This brings us, at length, to the question of the adequacy of counsel's representation. In essence, appellant complains that trial defense counsel failed to object to testimony relating to appellant's uncharged misconduct, and counsel failed ultimately to object to admission of the just-considered statements of the victim. Regarding the uncharged misconduct, insofar as we can determine, this evidence was properly admissible for the reasons indicated by the military judge, and the judge's limiting instructions in this regard seem beyond reproach. Regarding the victim's statements, we have already held that they were relevant for the limited purpose offered and that undue prejudicial impact is not apparent.

Regarding defense counsel's apparent strategy, we make a few more observations in light of the claim of inadequate representation. Literally, the complaint alleges that counsel *failed to object* to admission of the statements, and he even conceded that the "door was open." We agree that the door was open, so counsel's failure to object could not be a basis of inadequacy, as objecting at that point would not have been successful.

In addition, as indicated, it does not appear to us that the defense opened the door to the status of the marriage or to inferences to be drawn therefrom. By the time defense counsel got a shot at the witnesses, that was old news.

Our review of the case shows that counsel had a horrible set of facts to contend with. Through appellant's successive recantations and admissions, he had established one of the most remarkable examples of consciousness of guilt this Court has ever seen. Further, on his own, appellant had established a motive, an opportunity, and the capability of committing the offense; he placed himself at the scene of the crime; he certified himself as a liar; he tendered an implausible, transparent, and self-serving claim of innocence; and he highlighted his destruction and concealment of evidence and his deliberate misdirection of the search for his wife. Coupled with the physical evidence that escaped appellant's cleanup measures and the third-party witnesses, counsel faced a daunting challenge.

Indeed, it would seem appellant left counsel few real options. Counsel can hardly be faulted for choosing to cling to appellant's last iteration that the victim fell off the pier, but not at appellant's hands. Counsel could proceed on this theory in one of two manners. He could accept the Government's portrayal of appellant as an uncaring brute with a powerful urge to terminate his wife's life, as was inferable from the government witnesses' testimony; or counsel could attempt to undercut this showing by eliciting testimony that there was some tenderness left in the marriage, such that appellant would not have tried to kill his wife. Logically, the defense chose to attempt the latter.

If choosing this tack triggered admission of the victim's statements, counsel can hardly be faulted. In any event, the statements were largely redundant of other evidence already in the record, and they do not appear to have been incrementally very damaging. In addition, the fact that the victim was going about saying these things actually supported the defense theory that she had finally seized the opportunity to make her escape from appellant. That the strategy did not succeed is not the test of adequacy of representation. Nothing in this record suggests that counsel was deficient in seeking to humanize appellant. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Chief Judge SULLIVAN and Senior Judge EVERETT concur.

### APPENDIX

(1) [S]he told me that she was scared of [appellant].

(2) I told her to leave and she said she can't because she knows that [appellant's] going to follow her and he's frightened her that he's gonna kill her.

(3) One day she come to my house and she told me that [appellant] tried to push her off the boat.

(4) [S]he told me that [appellant]—she was in the bedroom and [appellant] came in and he grab a pillow he push her at the bed and he put that on her face.

(5) And she said that when she went out to the door, [appellant] grab her at the hair and she fell down and she said ....[appellant] told her if she leave, he's going to kill her.

(6) She told me that [appellant] always frighten her.

(7) One day she told me that they went fishing one day and [appellant] has a knife and he's doing something and

Bella ask her if the knife was sharp and [appellant] said, "Yeah. Let me try this on you." He said, "You want me to try this on you?"

(8) [S]he said that she believed that her husband is going to kill her.

(9) I said, "I only have $10 Australian" and I asked her what's she's going to do with the money and she said she wants to come to my house. And I ask her where she at. She said, "I'm on base right now." And I ask her what's wrong and she said that she has a fight with [appellant] and he— she said that [appellant] tried to choke her.

(10) She told me one time that [appellant] almost killed her.

(11) She told me that [appellant] tried to kill her.

(12) She told me that [appellant] tried to choke her.