UNITED STATES, Appellee,

v.

Specialist Curtis L. SHEPARD, 242–25–9662, United States Army, Appellant.

ACMR 9001374.

U.S. Army Court of Military Review.

8 Jan. 1992.

As Corrected Jan. 27, 1992.

For Appellant: Captain Brian D. Bailey, JAGC, Captain Mark L. Toole, JAGC (on brief).

For Appellee: Colonel Alfred F. Arquilla, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Major Maria C. Fernandez, JAGC, Captain Robert J. Walters, JAGC (on brief).

Before JOHNSON, WERNER and GRAVELLE, Appellate Military Judges.

## OPINION OF THE COURT

GRAVELLE, Judge:

The appellant was charged with premeditated murder of his wife. Contrary to his plea, he was convicted by a general court-martial consisting of officer and enlisted members of unpremeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918 (1982) [hereinafter UCMJ]. The convening authority approved the adjudged sentence of a dishonorable discharge, confinement for life, forfeiture of all pay and allowances, and reduction to Private E1.

The appellant asserts, *inter alia*, that the military judge erred in failing to suppress his unwarned statements to his platoon sergeant; in failing to suppress his confession because it was tainted by prior unwarned statements; and in not excluding prejudicial uncharged misconduct. We find no error as to these issues. He also asserts that the military judge erred in allowing into evidence certain hearsay statements made by the victim as "state of mind" exceptions to the hearsay rule under Manual for Courts–Martial, United States, 1984, Mil.R.Evid. 803(3) [hereinafter Mil. R.Evid.]. We find the military judge erred in admitting the victim's statements and also erred in his instructions to the members regarding this evidence. Finally, the appellant asserts that he was denied his right to consult with his appointed counsel during interrogation. We disagree that he was denied counsel.

### I. Facts

The appellant killed his wife during a domestic quarrel in their off-post German apartment as he was preparing for the duty day. She had returned that morning after spending the previous four days at the home of a friend. Her temporary absence and her intent to permanently leave the appellant were the subject of the domestic quarrel. As a result of the quarrel and killing, the appellant failed to report for the 0630 formation at his unit. When the appellant did arrive shortly after 0630, he approached his squad leader and told him, "You need to call the MPs [military police]." When the squad leader asked

why, the appellant said, "You don't know yet. You'll find out. I just need the MPs." The appellant was very excited and was speaking very rapidly. The squad leader felt that there must be something far more serious involved than missing formation, but he did not inquire further and sent the appellant to talk to Sergeant Logan, the platoon sergeant.

Knowing that the appellant had missed formation and thinking that the appellant wished to discuss his tardiness, but without advising the appellant of his rights under Article 31, UCMJ, 10 U.S.C. § 831, Sergeant Logan told the appellant to come into his office. The appellant blurted out that he needed to go to jail. Sergeant Logan, confused by this statement, made "small talk" by inquiring about the appellant's wife and children. When Sergeant Logan inquired why the appellant felt he needed to go to jail, the appellant said that he had killed his wife. Sergeant Logan didn't believe him because the appellant had used the excuse of injury of his wife for his tardiness before. But, on this occasion, Sergeant Logan asked for further details. The appellant said he killed his wife in his house with an axe and that he was sure she was dead because he watched her die. Sergeant Logan, still skeptical, took the appellant to the first sergeant and told the appellant to repeat his story. The appellant repeated to the first sergeant that he had killed his wife.

The first sergeant, recognizing a rights-warning problem, told the appellant to stop talking and had Sergeant Logan notify the MPs and request that an ambulance be dispatched to the appellant's apartment. At that point, the appellant spontaneously gave Sergeant Logan his house keys and said that his young children were locked in their bedroom. Sergeant Logan then noticed for the first time that there was blood on the appellant's boots and uniform, and began to believe that the appellant was telling the truth. After Sergeant Logan notified the MPs, the first sergeant apprehended the appellant and assigned another noncommisioned officer to guard the appellant until the military police arrived.

■ Two hours later, Special Agent Fratichelli, Criminal Investigation Command (CID), took a statement from the appellant after the appellant was transported to the CID office by the military police. The CID agent was not involved in the initial report or investigation of the case and was only vaguely aware that the appellant had "spontaneously" reported the killing to "someone," possibly an MP desk sergeant. He was unaware of the statements made to Sergeant Logan or the first sergeant. Mr. Fratricelli advised the appellant of his rights but did not give a "cleansing warning" as part of the rights advisement prior to taking the appellant's statement.[1] Waiving his right to remain silent and his right to counsel, the appellant admitted he killed his wife with a kitchen knife. The CID interview began at about 1000; the appellant's statement, reduced to writing and reviewed by the appellant, was signed by him at 1130.

Shortly after 1100, the local senior defense counsel, hearing that a suspect was being questioned by the CID for murder, appointed CPT R, a defense counsel, to represent the appellant. CPT R immediately called the CID office and asked to speak with the appellant. The CID agent-in-charge checked on the progress of the interview and was told that the appellant was reviewing the completed typewritten statement prior to signing it. The CID chief, at about 1120, after consulting with the trial counsel and without notifying the appellant or agent Fratricelli, refused CPT R's request to speak with the appellant. CPT R's subsequent attempts to gain access to the appellant by telephoning the trial counsel and by visiting the CID office were also to no avail. The appellant did not know of CPT R's appointment to represent him, of her immediate availability or of her attempt to contact him.

---

1. A "cleansing statement" or "cleansing warning" is advice given by an investigator to a suspect that the contents of previous unwarned statements may not be used against him. *See,* *e.g. United States v. Phillips,* 32 M.J. 76, 78 (C.M.A.1991); *United States v. Martindale,* 30 M.J. 172, 178 (C.M.A.1990); *United States v. Spaulding,* 29 M.J. 156, 158 (C.M.A.1989).

## II. Trial Proceedings

At trial, the appellant moved to suppress the statements he made to Sergeant Logan, to the first sergeant, and to Special Agent Fratichelli. The defense counsel did not oppose the appellant's statement to the squad leader. After hearing evidence and arguments on the motions, the military judge ruled that the appellant's statements to SFC Logan were admissible but excluded the statement made to the first sergeant. Regarding the confession made to Special Agent Fratichelli, the military judge found that it was not tainted by any previous statement, that the rights warnings were correctly given, and that the statement was admissible into evidence.

Also at trial, the government moved to admit statements made to acquaintances by the appellant prior to the murder regarding his marital difficulties, his threat to kill his wife if she was cheating on him, his feeling that he would be better off with his wife dead, and his desire to be rid of his wife. The trial counsel offered these statements under Mil.R.Evid. 801(d)(2)(A) as admissions by a party-opponent showing intent and state of mind. The military judge permitted these statements into evidence.

The government, likewise, moved to admit statements of the victim, Sherran Shepard, made to three different persons. To Mrs. Kubeka, a babysitter and confidant, Sherran Shepard had stated, four days prior to her death, that she "did not want to stay with a drunk who beat her." Because of the appellant's violent conduct, Mrs. Shepard asked Mrs. Kubeka if she (Shepard) could stay with her temporarily.[2] Mrs. Kubeka also testified that she had that same day accompanied Sherran Shepard to the legal assistance office when Mrs. Shepard was seeking information on a divorce. To Mrs. Merica, Sherran Shepard's work supervisor, the victim expressed her fear of the appellant, said that he beat her and threatened to kill her, and showed Mrs. Merica bruises on her body allegedly inflicted by the appellant. To Mrs. Carter, a drug and alcohol counselor, Sherran Shepard discussed her failing marriage and related that the appellant had threatened her with a knife with which he had cut her clothing and her hair.

The government's theories of admissibility of these witness' hearsay testimony was that it tended to prove Sherran Shepard's state of mind under Mil.R.Evid. 803(3) or was residual hearsay under Mil.R.Evid. 803(24). The trial counsel argued that Mrs. Shepard's fear of her husband, her intent to permanently leave the family home, and her intent to seek a divorce were relevant in tending to show premeditation, intent, motive and lack of accident. The defense counsel opposed the admission of these statements as hearsay, argued that the statements reflected uncharged misconduct, were not relevant to prove the appellant's state of mind, and were more prejudicial than probative of any issue in contention. The military judge ruled the evidence was admissible under Mil.R.Evid. 803(3), was relevant and not barred by Mil.R.Evid. 404(b), and more probative than prejudicial under standards of Mil.R.Evid. 403. He did not rule whether the statements qualified as residual hearsay.

The military judge, recognizing the need for limiting instructions regarding the uncharged misconduct aspects of both the appellant's and the victim's statements regarding threats and domestic discord, instructed the members prior to their deliberations on findings as follows:

Now, throughout the course of the trial, you have heard of physical altercations occurring between the accused and his wife through the testimony of Mrs. Merica.... And you have received other testimony from various witnesses concerning threats made against Mrs. Shepard. How are you to consider this testimony? *This evidence was introduced for the limited purpose of its tendency, if any, to prove that the accused intended to kill Mrs. Shepard and to establish a possible motive that the accused may*

---

**2.** Mrs. Shepard did stay with Mrs. Kubeka for four days, returning to her own apartment the morning of her murder.

*have had to kill Mrs. Shepard.* You may not consider this evidence for any other purpose and you may not conclude that the accused is a bad person or has criminal tendencies and that he therefore committed the offense or any of its lesser included offenses as charged (emphasis added).

The defense counsel made no objection to this instruction, nor did he ask for additional instructions.

The appellant did not testify at trial. His defense, based on his statement to the CID agent and other evidence, was that he suffered from diminished mental capacity because of alcohol abuse and a personality disorder, and that he acted in heat of passion during an argument with his wife and had not intended to kill her. While the appellant says in his statement that his wife brandished a knife, he admitted that he wasn't threatened by the knife. He took it away from her and stabbed her with it out of anger, confusion, and frustration. The military judge and the defense counsel agreed that self-defense was not an issue in this case. The government's theory was that the appellant premeditated the murder because of his wife's infidelity and her intent to terminate the marriage. The only real issue presented to the members was the "level" of the homicide to be determined by the appellant's state of mind and intent. The military judge, with the defense counsel's concurrence, instructed the members not only on premeditated murder but also on the lesser included offenses of unpremeditated murder, voluntary manslaughter, and involuntary manslaughter while perpetrating an aggravated assault.

### III. The Appellant's Statements

#### A. *Statements Made Prior to the Killing*

■■■ The military judge ruled that the appellant's statements made to acquaintances expressing concern about his marital difficulties, expressing a desire to kill his wife if she was cheating on him, and to be rid of his wife, were admissible under Mil.

R.Evid. 801(d)(2)(A) which provides that a statement is not hearsay if it is an admission by a party-opponent. If uttered by the accused, the statement is admissible unless excluded by some other rule of evidence. *See generally United States v. Garries,* 19 M.J. 845 (A.F.C.M.R.1985), *aff'd,* 22 M.J. 288 (C.M.A.) (not discussing issue), *cert. denied,* 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1986). We find that the statements were not barred by any other evidentiary rule, were relevant to show motive and intent, and their probity outweighed their prejudicial effect. *See id.; United States v. Rivera,* 23 M.J. 89 (C.M.A.1986), *cert. denied,* 479 U.S. 1091, 107 S.Ct. 1302, 94 L.Ed.2d 157 (1987). We hold that the military judge correctly admitted the appellant's statements into evidence under Mil. R.Evid. 801(d)(2)(A).[3]

#### B. *Statements Made After the Killing*

■■■ The military judge found that no rights warnings were necessary at the time Sergeant Logan told the appellant to come into his office. Even after the appellant's blurted comment about needing to go to jail, the platoon sergeant had no indication of any specific criminal activity by the appellant other than the appellant's "lapse of duty or conduct" in failing to go to the morning formation. *See, e.g., United States v. Seay,* 1 M.J. 201 (C.M.A.1975) (Cook, J., concurring in the result); *United States v. Lewis,* 12 M.J. 205 (C.M.A.1982); *United States v. Seeloff,* 15 M.J. 978 (A.C.M.R.), *pet. denied,* 17 M.J. 18 (C.M.A. 1983). We find, as did the military judge, that Sergeant Logan's *initial* questions about the appellant's wife and family were not designed to elicit criminal admissions. *See United States v. Barnes,* 19 M.J. 890 (A.C.M.R.1985), *aff'd,* 22 M.J. 385 (C.M.A. 1986) (summary disposition). The military judge found that Sergeant Logan's *subsequent* questions about the wife's condition and location were motivated by concerns for the health and safety of the wife. He found the statement voluntary and that the

---

3. There is also a second basis for admissibility of the appellant's statement: it illustrated the appellant's then existing state of mind, admissible under Mil.R.Evid. 803(3), discussed in another context *infra. See United States v. Elliott,* 23 M.J. 1 (C.M.A.1986).

"public safety exception" applied.[4] We find no abuse of discretion. *See United States v. Jones,* 26 M.J. 353 (C.M.A.1988); *United States v. Anderson,* 21 M.J. 751 (N.M.C.M.R.1985); *Barnes,* 19 M.J. 890, *aff'd,* 22 M.J. 385; *Seeloff,* 15 M.J. at 978. Even assuming, *arguendo,* that it was error to admit the latter parts of the appellant's statement to his platoon sergeant, we find that it was harmless error as the evidence was cumulative of other evidence of guilt.

■ Further, we find no abuse of discretion in the military judge's admission into evidence of the appellant's confession to the CID investigator rendered after proper rights warnings. Assuming without deciding that the military judge was correct in excluding the appellant's statement to his first sergeant, we find the statement did not taint his voluntary confession to the CID investigator. *Phillips,* 32 M.J. 76; *United States v. Steward,* 31 M.J. 259 (C.M.A.1990); *Spaulding,* 29 M.J. 156; *United States v. Vogel,* 39 C.M.R. 160 (C.M.A.1969). Utilizing the tests set out in *United States v. McCaig,* 32 M.J. 751, 753 (A.C.M.R.1991), we find that: there was a time lapse between the questioning periods; the conditions rendering the statement to the first sergeant inadmissible did not persist through the later statement to the CID agent; the appellant was given adequate rights warnings by the CID agent; the CID agent was not involved in taking the previous inadmissible statements; there were no bootstrapping references to the previous statements; and, there was no illegal or unethical conduct by the CID agent that caused the appellant to "let the cat out of the bag." These facts weigh heavily in favor of admissibility of the confession. Under the totality of circumstances, we hold that the statement made to the CID investigator was voluntary and not the product of the earlier unwarned statement to the first sergeant.

## IV. The Victim's Statements

The military judge ruled that the victim's statements were admissible as "state of mind" hearsay exceptions under Mil. R.Evid. 803(3). This rule provides in pertinent part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(3) *Then existing mental, emotional or physical condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed. . . .

This provision is taken verbatim from Federal Rule of Evidence 803(3). It is also similar to Manual for Courts–Martial, United States, 1969 (Rev. ed.), para. 142b, "but may be more limited in that it may not permit statements by an individual to be offered to disclose the intent of another person." Manual for Courts–Martial, United States, 1984, Mil.R.Evid. 803(3) analysis, app. 22 [hereinafter MCM, 1984].

In tracing the history of the corresponding federal rule, the Court of Appeals for the Ninth Circuit quotes the Notes of the House Committee on the Judiciary:

However, the Committee intends that the Rule be construed to limit the doctrine of *Mutual Life Insurance Company v. Hillmon* [145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892)] so as to render statements of intent by a declarant admissible *only to prove his future conduct, not the future conduct of another person.* House Report No. 93–650, Note to Paragraph (3), 28 U.S.C.A. at 579.

*United States v. Pheaster,* 544 F.2d 353, 379 (9th Cir.1976), *cert. denied,* 429 U.S.

---

**4.** *See United States v. Loukas,* 29 M.J. 385, 389 and 395–96 (C.M.A.1990); *United States v. Morris,* 28 M.J. 8, 14 (C.M.A.1989); *Jones,* 26 M.J. 353, 356–57. While this finding by the military judge may appear at first blush to be at odds with the platoon sergeant's disbelief of the appellant's story, we find no inconsistency. When the platoon sergeant began asking serious questions about the whereabouts and condition of the wife and children it was beginning to dawn on him that maybe the appellant was telling the truth.

1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977) (emphasis added). *See also Elliott,* 23 M.J. at 7–8.

Despite the seeming clarity of the Committee's words, the limits of admissibility of such evidence remain clouded in controversy. *See, e.g. Pheaster,* at 380 n. 18; *United States v. Brown,* 490 F.2d 758, (D.C.Cir.1973) (collecting cases). *See also, United States v. Donley,* 878 F.2d 735, 738 (3rd Cir.1989), *(en banc ), cert. denied,* 494 U.S. 1058, 110 S.Ct. 1528, 108 L.Ed.2d 767 (1990) (murder victim's statement of plan to separate from her husband admissible to show defendant's motive for murder was other than claimed); *Garries,* 19 M.J. at 858 (murder victim's statement of intent to leave military service admissible to show the likely situs of the murder); *United States v. Dodson,* 16 M.J. 921, 928–929 (N.M.C.M.R.1983), *aff'd in part, rev'd in part on other grounds,* 21 M.J. 237 (C.M.A.), *aff'd on rehearing,* 22 M.J. 257 (C.M.A.), *cert. denied,* 479 U.S. 1006, 107 S.Ct. 644, 93 L.Ed.2d 701 (1986) (statement of murder victim that anyone who wanted to rob him would have to kill him, made just after an attempted robbery by the accused, admitted as an excited utterance, was also admissible under the state-of-mind exception; statement of murder victim of his intended route of return to barracks admissible as state of mind exception).

The most recent Court of Military Appeals' guidance is in the case of *United States v. Elmore,* 33 M.J. 387 (C.M.A.1991). There are similarities between *Elmore* and the present case: both involve servicemen charged with murdering their wives and, both cases involve accuseds who did not testify, but made pretrial statements. In addition, both cases involve introduction of a series of statements of the victim which were generally classified in three groups: that the victim was frightened of her husband, and frightened that he might kill her; that the husband had threatened to kill the victim in the past; and, that the husband had physically abused the victim in the past. *See Elmore,* 33 M.J. at 394. How-

ever, there are critical differences. In *Elmore,* unlike the present case, there was a dispute about the harmony of the marital relationship. Most critically, the prosecutor in *Elmore* presented the statements, accompanied by cautionary instructions, not for the truth of the matters asserted, but for the fact the victim made them, thus focusing on the *victim's* state of mind. Finally, in *Elmore,* the defense counsel agreed that the statements were admissible to show her state of mind and to rebut the implication that the relationship was harmonious.

In *Elmore,* the Court of Military Appeals, recognizing that Mil.R.Evid. 803(3) limited state of mind evidence to the *declarant's* state of mind, was of the opinion that only statements of the victim relating to her fear of Elmore were admissible. Statements of the victim reciting prior threats and assaults were not admissible to prove the truth of the matters asserted. *Id.* at 396.

 We hold that the statements of the victim reciting her fear of the appellant qualify as "state of mind" evidence under Mil.R.Evid. 803(3). However, other statements of the victim regarding the appellant's threats and assaults do not qualify because such statements regarding past events are statements of "memory or belief," specifically excluded by Mil.R.Evid. 803(3). Moreover, these latter statements were not admissible as residual hearsay under Mil.R.Evid. 803(24) because we find that the statements were not more probative than any other available evidence, that is, the appellant's own statements roughly paralleled the victim's statements. In short, these latter statements are hearsay, and the military judge erred in permitting the statements into evidence.[5]

 Even though we hold that the victim's statements reciting her fear of the appellant qualify as an exception to the hearsay rule under Mil.R.Evid. 803(3), to be admissible, the evidence must be logically

---

**5.** Because of this holding, we need not address whether this evidence is admissible under Mil. R.Evid. 404(b).

relevant to a material issue in the case. Mil.R.Evid. 401 and 402. Furthermore, the probative value must substantially outweigh the danger of unfair prejudice. Mil. R.Evid. 403. Regarding this latter issue of weighing probity against undue prejudice, we find the following observations of the Court of Appeals for the District of Columbia Circuit instructive in cases such as this:

> Quite a number of courts have confronted facts ... involving hearsay statements made by the victim of a homicide which inferentially implicate the defendant. Such statements by the victim often include previous threats made by the defendant towards the victim, narrations of past incidents of violence on the part of the defendant or general verbalizations of fear of the defendant. While such statements are admittedly of some value in presenting to the jury a complete picture of all the facts and circumstances surrounding the homicide, it is generally agreed that their admissibility must be determined by a careful balancing of their probative value against their prejudicial effect. Courts have recognized that such statements are fraught with inherent dangers and require the imposition of rigid limitations. The principal danger is that the jury will consider the victim's statement of fear as somehow reflecting on the *defendant's* state of mind rather than the victim's—*i.e.*, as a true indication of [the] defendant's intentions, actions or culpability. Such inferences are highly improper and where there is a strong likelihood that they will be drawn by the jury the danger of injurious prejudice is particularly evident.
>
> The quantum of prejudice, as stated above, is highest when the circumstantial facts in the statement are intimately related to the issue to be proved. In the context of homicide cases such as this, it is clear that where the improper purpose for which the jury might consider the evidence bears closely on the central question of defendant's guilt or innocence there is less likelihood that the jury will confine the statement to its proper realm.

*Brown*, 490 F.2d at 765–66 (footnotes omitted) (emphasis in original). *See also Shepard v. United States*, 290 U.S. 96, 103–04, 54 S.Ct. 22, 25–26, 78 L.Ed. 196 (1933) (statement of murder victim that appellant poisoned her more prejudicial than probative).

We find the evidence relevant under Mil. R.Evid. 402. However, mindful of the valid warnings of *Brown*, we believe that under the circumstances, the military judge abused his discretion in determining that the "state of mind" statements of the victim were more probative than prejudicial under Mil.R.Evid. 403. We find that the probative value did not substantially outweigh the danger "of unfair prejudice, confusion of the issues, or misleading the members." Mil.R.Evid. 403.

 Finally, we find that the military judge compounded his error by failing to provide clear instruction to the members on the uses that could be made of this dangerous evidence. The instruction did not provide clear guidance to the members when clear guidance was required. Indeed, the instruction, which was nothing more than a tailored instruction on uncharged misconduct under Mil.R.Evid. 404,[6] while proper for uncharged misconduct, had the opposite and wrong effect in the context of state-of-mind evidence.[7] It in effect limited the members' consideration of the evidence to determining the *appellant's* state of mind.

---

6. The instruction was taken from the Military Judges' Benchbook instruction, for "other offenses or acts of misconduct by accused." *See* Dep't of Army, Pam. 27–9, Military Judges' Benchbook, para. 7–13 (1 May 1982).

7. *Compare* this instruction with that given by the military judge in *Elmore*, 33 M.J. at 395. Unlike the instruction in *Elmore*, which is also a "modified 404(b) instruction," the instruction in the present case never provided a meaningful basis or rationale for the members' consideration of the evidence. We also note that the instruction in *Elmore* was given immediately *before* the presentation of the evidence in question rather than as part of the overall instructions on findings just prior to the members' deliberations. Even the *Elmore* instruction was not perfect. *See id.*, n. 8.

■ Having found error in the military judge's rulings regarding the "state of mind" evidence and in his instruction to the members regarding the use they could make of the evidence, we must determine the effect of the errors on the trial. We find that the admission into evidence of all the victim's statements, whether or not they qualify under Mil.R.Evid. 803(3), was harmless error because they are cumulative of other evidence admitted at trial. We also find that the military judge's instruction, although erroneous, did not cause a miscarriage of justice or affect the fairness and integrity of the judicial process, such as would amount to plain error. *United States v. Fisher*, 21 M.J. 327 (C.M.A.1986); *United States v. Yanke*, 23 M.J. 144 (C.M.A.1987). In the absence of plain error, the defense counsel's failure to object to an instruction before the members close to deliberate constitutes waiver of the objection. Rule for Courts–Martial 920(f); *United States v. Hargrove*, 25 M.J. 68 (C.M.A.1987), *cert. denied*, 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988); *United States v. Grandy*, 11 M.J. 270, 277 (C.M.A. 1981); *United States v. Salley*, 9 M.J. 189 (C.M.A.1980). After reviewing the entire record, we find waiver is appropriate here.

However, assuming, *arguendo*, the instructional error is not waived, we find that it was harmless in the overall context of this case. *See United States v. Langley*, 33 M.J. 278, 283 (C.M.A.1991) (it is permissible to apply a harmless error analysis to instructional errors). We find the error is harmless because the statements of the victim were roughly parallel to and cumulative of statements made by the appellant himself prior to and after the killing, concerned marital disharmony not in dispute, and unlike cases such as *Shepard v. United States*, the central question was not the appellant's guilt or innocence, but the degree of guilt.[8]

## V. The Right to Counsel

The appellant personally asserts that he was deprived of his right to counsel because the CID refused to interrupt the CID custodial interrogation and permit CPT R to talk with him. We find no violation under the unique chronology of this case.

■ The case at issue does not implicate the constitutional right to counsel under either the Fifth or Sixth Amendments.[9] However, our analysis does not stop with the constitutional right to counsel. There is an evidentiary standard in military law that we must consider. Military Rule of Evidence 305(e) states in pertinent part:

When a person subject to the code who is required to give warnings under [Mil.

8. Reinforcing our view that the error was harmless was the court-martial's rejection of the government's premeditation theory. The members ultimately rejected the government's argument that the murder was premeditated and found the appellant guilty of unpremeditated murder (*i.e.*, the intent to kill or to inflict great bodily harm was formed in the heat of sudden passion without adequate provocation). *Compare* MCM, Part IV, para. 43c and 44c.

9. The Sixth Amendment right to counsel does not attach until a prosecution is commenced; that is, at or after the initiation of adversarial judicial criminal proceedings. *United States v. Gouveia*, 467 U.S. 180, 188, 104 S.Ct. 2292, 2297–98, 81 L.Ed.2d 146 (1984) *quoting Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion). In military criminal law, the Sixth Amendment right to counsel attaches with the preferral of charges. *United States v. Jordan*, 29 M.J. 177 (C.M.A. 1989), *cert. granted and judgment vacated*, — U.S. ——, 111 S.Ct. 575, 112 L.Ed.2d 580 (1990); *United States v. Wattenbarger*, 21 M.J. 41 (C.M.A.1985), *cert. denied*, 477 U.S. 904, 106

S.Ct. 3272, 91 L.Ed.2d 563 (1986). Under the Fifth Amendment, the appellant must express his desire to deal with the police through counsel in order for that right to attach. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *Jordan*, 29 M.J. at 187. *See also McNeil v. Wisconsin*, — U.S. ——, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (distinguishing the Fifth and Sixth Amendment rights to counsel). In the instant case, the appellant knowingly waived the right to counsel prior to the CID interrogation. To put it another way, the appellant did not express his desire (and expressly waived his right) to deal with the police through counsel. The military judge properly found no error of constitutional dimensions, relying on the Supreme Court's opinion in *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), wherein the Court found no duty upon the police under the Fifth or Sixth Amendments to interrupt an ongoing custodial interrogation when counsel insists upon speaking with the interrogee.

R.Evid. 305(c)] intends to question an accused or person suspected of an offense and knows or reasonably should know that counsel *either has been appointed for* or retained by the accused or suspect with respect to that offense, *the counsel must be notified of the intended interrogation and given a reasonable time in which to attend before the interrogation may proceed* [emphasis added].

*See also United States v. McOmber,* 1 M.J. 380 (C.M.A.1976) (the genesis of Mil. R.Evid. 305(e)); *United States v. Spencer,* 19 M.J. 184, 187 (C.M.A.1985) (Mil.R.Evid. 305(e) to be applied liberally).

▪▪▪ We hold that the provisions of Mil.R.Evid. 305(e) have not been violated in this case.[10] Prior to the interrogation the appellant, after proper rights warnings, stated he did not wish to consult with a lawyer or have a lawyer present during questioning. Acceptance of that statement at face value by the CID investigator was reasonable under the circumstances. There is no duty under Mil.R.Evid. 305(e) for investigators, merely because of the proximity of a Trial Defense Service office, to affirmatively verify that an attorney has not been appointed for a suspect prior to the commencement of an interrogation.

When the interrogation commenced, no defense counsel had been appointed, and no requirement for notification of counsel existed. When CPT R contacted the CID to say she had been appointed to represent the appellant, any notification requirement for the CID was moot. Further, by the time that CPT R notified the CID of her appointment to represent the appellant, the CID interrogation was all but over.[11]

The remaining issues, including those personally raised by the appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982), are without merit.

10. The military judge apparently did not consider Mil.R.Evid. 305(e) in denying the defense counsel's motion for relief.

11. Even though we find no error in this case, the better course of action for the CID would have been to interrupt the interrogation and

The findings of guilty and the sentence are affirmed.

Senior Judge JOHNSON and Judge WERNER concur.

advise the appellant that a defense counsel had been appointed (and was present outside). Such a procedure would have eliminated the appearance of "gamesmanship" and insured that not only the letter but the spirit of Mil.R.Evid. 305(e) was followed. *See Spencer,* 19 M.J. 184.